1   Les M. Coughran, WSBA # 34407
BARLOW COUGHRAN
2   MORALES & JOSEPHSON, P.S.
1325 Fourth Ave Suite 910
3   Seattle, WA  98101
Telephone: (206) 224-9900
4   Facsimile: (206) 224-9820
E-mail: lesc@bcmjlaw.com
5
Douglas M. Lash, WSBA #48531
6   BARLOW COUGHRAN
MORALES & JOSEPHSON, P.S.
7   1325 Fourth Ave Suite 910
Seattle, WA  98101
8   Telephone: (206) 224-9900
Facsimile: (206) 224-9820
9   E-mail: douglasl@bcmjlaw.com

10

11                      UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
                            AT SEATTLE
12

13   BOARD OF TRUSTEES OF THE
AUTOMOTIVE MACHINISTS
14   PENSION TRUST,                          NO.
                            Plaintiffs,
15          v.                              COMPLAINT TO VACATE
                                            ARBITRATOR'S AWARD ON
16   PENINSULA TRUCK LINES, INC.,           WITHDRAWAL LIABILITY

17                          Defendant.

18          Plaintiff Board of Trustees of the Automotive Machinists Pension Trust (hereafter the

19   "Pension Trust") files this action against Defendant Peninsula Truck Lines, Inc. (hereafter the

20   "Employer") to vacate Arbitrator Dubow's Final Award dated December 22, 2020 ("Award"),

21   attached as Exhibit A, and alleges as follows:

22

COMPLAINT TO VACATE ARBITRATOR'S
AWARD ON WITHDRAWAL LIABILITY – 1

BARLOW COUGHRAN
MORALES & JOSEPHSON, P.S.
1325 FOURTH AVE, SUITE 910
SEATTLE, WA 98101
(206) 224-9900

1.      On April 19, 2019, the Pension Trust sent the Employer a Notice of Withdrawal Liability Assessment.  In response, the Employer admitted that it owed withdrawal liability, but contended that the Pension Trust calculated the withdrawal liability payment schedule incorrectly and initiated a demand for arbitration. On December 22, 2020, the Arbitrator issued an Award, directing the Pension Trust to recalculate the Employer's withdrawal liability payment schedule. The Pension Trust contends that the Arbitrator erred in applying the law governing the computation of the Employer's withdrawal liability payment schedule and files this action to vacate the Award.

## JURISDICTION

2.      This Court has jurisdiction pursuant to 29 U.S.C. § 1401(b)(2), § 1451(a)(1) and § 1451(c) because this is a civil action by plan fiduciaries for appropriate legal relief and, more specifically, an action for an Order vacating an award in arbitration under the Multiemployer Pension Plan Amendment Act ("MPPAA"), a section of the Employee Retirement Income Security Act ("ERISA").

## VENUE

3.      Venue is proper in this Court pursuant to 29 U.S.C. § 1451(d) because the plan is administered in Mercer Island, Washington.

## ALLEGATIONS OF FACT

4.      The Pension Trust is a multiemployer pension fund maintained and administered to provide retirement benefits to its plan participants. The Pension Trust is established and maintained pursuant to ERISA.

COMPLAINT TO VACATE ARBITRATOR'S
AWARD ON WITHDRAWAL LIABILITY – 2

BARLOW COUGHRAN
MORALES & JOSEPHSON, P.S.
1325 FOURTH AVE, SUITE 910
SEATTLE, WA 98101
(206) 224-9900

104.000 WDL ea19hs014d

5.    The Employer entered into a collective bargaining agreement ("CBA") with the Machinists District Lodge No. 160 (the "Union").

6.    The CBA obligated the Employer to make contributions to the Pension Trust at a specified rate for each compensable hour worked by the Employer's employees.

7.    The Employer, through the collective bargaining process with the Union, agreed to submit supplemental contributions to the Trust consistent with Schedule A, i.e., the Preferred Schedule, of the Pension Trust's 2009 Rehabilitation Plan effective beginning with November 2010 work hours in its May 1, 2010 – October 31, 2011 collective bargaining agreement with the Union.

8.    The Employer and Union agreed to two subsequent collective bargaining agreements dated November 1, 2012 – May 31, 2015 and June 1, 2015 – May 31, 2018, respectively, that included a contribution rate schedule consistent with the Preferred Schedule in the Pension Trust's Rehabilitation Plan.

9.    The Employer had a complete withdrawal from the Pension Trust during the 2018 Plan Year.

10.    The Pension Trust served the Employer with Notice of Withdrawal Liability and included the schedule of payments required under ERISA, and those payments were calculated using the highest contribution rate at which the Employer had an obligation to contribute under the plan pursuant to ERISA § 4219(c)(1)(C)(i), 29 U.S.C. § 1399(c)(1)(C)(i).

11.    In 2014, Congress passed the Multiemployer Pension Reform Act, which provided, in pertinent part, that supplemental contribution rates for plan years beginning after December 31, 2014 were excluded from the highest contribution rate for the purpose of

COMPLAINT TO VACATE ARBITRATOR'S
AWARD ON WITHDRAWAL LIABILITY – 3

BARLOW COUGHRAN
MORALES & JOSEPHSON, P.S.
1325 FOURTH AVE, SUITE 910
SEATTLE, WA 98101
(206) 224-9900

1    computing withdrawal liability payment schedules under ERISA § 4219(c)(1)(C)(i), 29 U.S.C.

2    § 1399(c)(1)(C)(i).

3        12.    The Pension Trust computed the Employer's withdrawal liability payment

4    schedule based on the highest contribution rate agreed to in the November 1, 2012 – May 31,

5    2015 collective bargaining agreement between the Employer and Union that was in effect as of

6    November 1, 2014.

7        13.    The Arbitrator concluded, in error, that the Fund erred in including the

8    bargained-for pre-MPRA supplemental contributions in computing the Employer's annual

9    withdrawal liability payment schedule.

10       14.    Arbitrator Dubow's Award is in contradiction with all other known arbitration

11   and federal district court decisions.  Indeed, Arbitrator Dubow's ruling in favor of an employer

12   on the same issue that is the subject of the instant dispute was recently overturned in *Board of*

13   *Trustees of the Western States Office and Professional Employees Pension Fund et al. v.*

14   *International Brotherhood of Electrical Workers Local 483, et al.*, No. 3:20-CV-00156-IM,

15   2020 WL 7318131, (D. Or. Dec. 11, 2020) (Attached as Exhibit B).  Arbitrator Dubow's Final

16   Award is also contrary to seven other known arbitration decisions that have been decided in

17   favor of pension funds on the issue before the Court in this Complaint.

18                                   **CLAIM FOR RELIEF**

19       15.    Arbitrator Dubow erred in construing ERISA § 4219(c)(1)(C)(i), 29 U.S.C. §

20   1399(c)(1)(C)(i), to conclude that that the bargained-for pre-MPRA supplemental contributions

21   should not be included in the computation of the Employer's withdrawal liability payment

22   schedule as a matter of law.

COMPLAINT TO VACATE ARBITRATOR'S
AWARD ON WITHDRAWAL LIABILITY – 4

104.000 WDL ea19hs014d

16.    The Court reviews the Arbitrator's conclusions of law in a proceeding under ERISA § 4221(b)(2), 29 U.S.C. § 1401(b)(2) under the *de novo* standard of review. *Trustees of Amalgamated Ins. Fund v. Geltman Indus., Inc.*, 784 F.2d 926, 928–29 (9th Cir. 1986).

17.    The Pension Trust is entitled to judgment vacating the Arbitrator's Award.

## **PRAYER FOR RELIEF**

WHEREFORE, the Pension Fund respectfully requests that this Court vacate Arbitrator Dubow's December 22, 2020 Award, followed by a determination on the Pension Trust's petition for attorney fees to be submitted following a decision on the merits.

DATED this 19th day of January, 2021.


     /s/  Les M. Coughran
Les M. Coughran, WSBA # 34407
BARLOW COUGHRAN
MORALES & JOSEPHSON, P.S.
Attorneys for the Plaintiff Trust Funds


     /s/  Douglas M. Lash
Douglas M. Lash, WSBA # 48531
BARLOW COUGHRAN
MORALES & JOSEPHSON, P.S.
Attorneys for the Plaintiff Trust Funds

COMPLAINT TO VACATE ARBITRATOR'S
AWARD ON WITHDRAWAL LIABILITY – 5

104.000 WDL ea19hs014d

# EXHIBIT A

**AMERICAN ARBITRATION ASSOCIATION**
**Multiemployer Pension Plan**
**Withdrawal Liability Tribunal**

PENINSULA TRUCK LINES, INC.

      Claimant

                                           AAA Case No. 01-19-0004-1578

      vs.

AUTOMOTIVE MACHINISTS
PENSION TRUST, and                         **FINAL AWARD**
BOARD OF TRUSTEES OF THE           **OF THE ARBITRATOR**
AUTOMOTIVE MACHINISTS
PENSION TRUST,

      Respondents

---

In 2018, claimant Peninsula Truck Lines, Inc. (Peninsula) incurred a complete withdrawal from the Automotive Machinists Pension Trust (AMPT). AMPT calculated Peninsula's withdrawal liability to be $3,858,988. Peninsula did not challenge AMPT's calculation of the withdrawal liability amount, but it asserted that AMPT erred in calculating Peninsula's annual withdrawal liability payment. Although it agreed that AMPT accurately calculated one component used to determine the annual withdrawal liability payment (the average annual hours in the highest three consecutive years during the ten years preceding withdrawal), it asserted AMPT inflated the second component of that calculation---the highest contribution rate. Peninsula contended that the highest contribution rate was $3.95 per hour worked by each bargaining unit employee, a figure that was the result of its bargaining with the union and which was contained in a collective bargaining agreement (CBA) with District Lodge No. 160, Local 289 of the International Association of Machinists and Aerospace Workers AFL-CIO (Local 289).  AMPT determined that the correct rate was $8.394 per hour, which included the preferred schedule rate paid to AMPT under a rehabilitation plan that it was required to adopt pursuant to the Pension Protection Act (PPA) amendment to ERISA because AMPT was in "critical status".[1] Thus, AMPT calculated that Peninsula's annual withdrawal liability payment should be $120,479, payable in quarterly installments of

1

---

[1] A fund is in critical status if its actuary determines that it is less than 65% funded.

$30,120. Peninsula calculated that its annual withdrawal liability payment should be $56,694 payable in quarterly installments of $14,174.

After AMPT denied Peninsula's request for review, Peninsula filed a demand for arbitration on November 22, 2019. Peninsula was represented by Jeremy E. Roller of the Arete Law Group. AMPT filed an answer denying Peninsula's claims on December 9, 2019. AMPT was represented by Douglas M. Lash and Les M. Coughran of McKenzie Rothwell Barlow & Coughran P.S.

**Background**

For many years, Peninsula made monthly payments to AMPT pursuant to CBAs it entered into with Local 289 based on a contribution rate that it negotiated with the union.  Peninsula also paid a preferred schedule rate determined under Schedule A of a rehabilitation plan adopted by AMPT[2].  The PPA required AMPT to adopt the rehabilitation plan because its actuary determined that it was in "critical status". The preferred schedule rate was recorded in the CBAs that Peninsula executed. Pursuant to a CBA between Peninsula and Local 289 entered into on September 19, 2018 and effective as of June 1, 2018, Peninsula's obligation to pay AMPT ceased, the consequence of which was that Peninsula executed a complete withdrawal from the fund and incurred withdrawal liability.

By letter dated April 19, 2019, AMPT sent a demand letter by certified mail to Peninsula in which it informed Peninsula that its withdrawal liability was $3,858,988. If Peninsula opted to pay the withdrawal liability over 20 years in 80 quarterly payments, then the annual payment due was $120,479 to be paid in quarterly installments of $30,120 beginning on June 1, 2019. The annual payment was based on two components. The first was the average annual hours in the highest three consecutive years during the ten years preceding the withdrawal year. That figure is 14,353, and is not in dispute. The second component was AMPT's calculation of the highest contribution rate that was in effect during the ten years concluding with the withdrawal year. AMPT concluded that this rate was $8.394. Peninsula disputes this component.

Peninsula requested a review of AMPT's calculation by letter dated July 30, 2019. Peninsula contended that AMPT erroneously included the rate that Peninsula paid pursuant to the rehabilitation plan adopted by AMPT. Peninsula asserted that the proper rate was $3.95, the rate that Peninsula paid without consideration of the payments due under the rehabilitation plan. By letter dated October 3, 2019, AMPT rejected the request for review. In essence, AMPT asserted that it correctly included payments made pursuant to the rehabilitation plan because they were contained in the relevant CBAs between Peninsula and Local 289. It is

2

---

[2] Schedule A was one of two schedules proffered by AMPT and is designated the "preferred schedule". The other schedule, Schedule B, is the "default schedule".

Peninsula's contention that these payments cannot be considered when assessing withdrawal liability because they do not "arise under" the CBAs.

Peninsula filed its demand for arbitration on November 22, 2019. It sought a declaration that the highest contribution rate to be used to determine its annual withdrawal liability obligation be $3.95, that AMPT be required to refund to Peninsula all overpayments plus interest through the date of this Award[3], and its attorney fees and costs.

In its answer dated December 9, 2019, AMPT not only denied Peninsula's contentions but also asserted that the arbitration demand was untimely and should be dismissed because it was sent more than 90 days after Peninsula received AMPT's letter. See 29 USC 1399(b)(2)(A). Thus, Peninsula was neither entitled to a review nor entitled to arbitrate any dispute concerning the calculation.  Peninsula countered that the request for review was timely because it did not receive AMPT's letter until July 24, 2019 and hence the request for review was timely because it was sent six days after the assessment letter was received

I was appointed as the Arbitrator on January 14, 2020. At a telephone conference with the parties on February 12, 2020, it was agreed that they would brief the issue of whether Peninsula's request for review was timely. If I found that the request for review was untimely, the arbitration demand would be dismissed. If not, then the parties would file briefs setting forth their positions and I would decide the matter based on the briefs.

 In a ruling dated June 15, 2020, I found that AMPT had sent the letter by certified mail to Peninsula's correct post office box address in Auburn, Washington, that the Post Office  did not place the letter in Peninsula's post office box, that AMPT knew that Peninsula did not receive the letter because the Post Office returned the letter to AMPT on May 28, 2019, and that Peninsula was not aware of the letter until it was  attached to a demand for the overdue first withdrawal liability payment that was received  by Peninsula on  July 24, 2019. Accordingly, I ruled that Peninsula's request for review was timely.

Pursuant to a scheduling order dated July 6, 2020, Peninsula filed an opening brief dated September 9, 2020. AMPT filed an opposition brief on October 7, 2020, and Peninsula filed a reply brief on October 21, 2020.

**The Relevant Statutes**

29 USC 1399 of the Multiemployer Pension Plan Amendments Act (MPPAA) imposes "withdrawal liability" on an employer who no longer wishes to participate in a multiemployer pension plan. The formula setting forth an employer's withdrawal liability is:

3

---

[3] Peninsula asserts that it has made all quarterly payments that were contained in AMPT's April 19, 2019 letter, as it is required to do by statute. AMPT does not deny this.

(I)     the average annual number of contribution base units for the period of 3 consecutive plan years, during the period of 10 consecutive plan years ending before the plan year in which the withdrawal occurs, in which the number of contribution base units for which the employer had an obligation to contribute under the plan is the highest, and

(II)    the highest contribution rate at which the employer had an obligation to contribute under the plan during the 10 plan years ending with the plan year in which the withdrawal occurs.

29 USC 1392(a) defines "obligation to contribute" as follows:

.....the term "obligation to contribute" means an obligation to contribute arising---

1)  under one or more collective bargaining units (or related) agreements, or
2)  as a result of a duty under applicable labor management law.[4]

29 USC 1085(e), which is part of the PPA, is designed to save plans that are in critical or endangered status. Section 1085(e)(1)(B) states that in any case in which a multiemployer plan is in critical status, it shall adopt a rehabilitation plan and shall provide to the bargaining parties one or more schedules showing revised benefit structures, revised contribution structures, or both. One schedule shall be designated as the default schedule and such schedule shall assume that there are no increases in contributions under the plan other than the increases necessary to emerge from critical status after future benefit accruals and other benefits have been reduced to the maximum permitted by law. If, after receiving the default schedule or one or more other schedules from the plan sponsor, the bargaining parties fail to adopt a schedule other than the default schedule, then the default schedule becomes effective 180 days after the CBA that was in effect at the time the rehabilitation plan was adopted. See 29 USC 1085(e)(3)(C)(i) and (iii). Since the bargaining parties need to "adopt" a schedule other than the default schedule, such schedule may be memorialized in the CBA. Nor does the statute prevent the bargaining parties from incorporating the default schedule in the CBA.

The enforcement mechanism for section 1085(e) can be found in subsection (3)(C)(iv). It states that "any failure to make a contribution under a schedule of contribution rates provided under this subsection shall be treated as a delinquent contribution under [29 USC 1145] and shall be enforceable as such". Section 1145 provides that "(e)very employer who is obligated to make contributions to a multiemployer plan under the terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not inconsistent

4

---

[4] AMPT does not contend that Peninsula's obligation to contribute arises under an applicable labor management law.

with law, make such contributions in accordance with the terms and conditions of such plan or such agreement".

In 2014, the PPA was amended by adding Section 1085(g), also known as the Multiemployer Pension Reform Act (MPRA). Subsection (3)(A) states: "Any increase in the contribution rate …that is required or made in order to enable the plan to meet the requirement of… the rehabilitation plan shall be disregarded in determining the allocation of unfunded vested benefits to an employer under section [29 USC 1399]…"

## Peninsula's Contentions

When calculating annual withdrawal liability payments, a fund may use only obligations to contribute "arising under" a CBA (or as the result of applicable labor-management relations law), not obligations arising under the PPA specifically or ERISA generally. Under the plain language of 29 USC 1392(a), payments required by a rehabilitation plan do not "arise under" a CBA, even if those payments are memorialized there.

The rehabilitation plan payments were not subject to negotiation by the bargaining parties to the CBAs. They were determined by the plan's actuaries, consistent with the PPA's requirements. Peninsula had no opportunity to bargain down the rehabilitation plan payments or raise them in return for other concessions. Hence they did not originate from a bargaining process or a CBA. Instead, they originated from ERISA's statutory requirements for plans in critical status.

The MPPAA indicates that a rehabilitation plan schedule recited in a CBA does not "arise under" that CBA because the statute did not distinguish between schedules that are memorialized in CBAs and default schedules that may not be.

29 U.S.C. 1085(j)(1) defines "bargaining parties" for purposes of plans in critical status as limited to (1) the employer and (2) the organization representing the unionized employees. This expressly excludes AMPT. The bargaining parties here had no say in the terms of the rehabilitation plan or their payments. Because the bargaining parties had no say in determining the payments under the rehabilitation plan, they could not have arisen under the CBA.

When Congress enacted the PPA, it added a separate enforcement provision for payments numbered subsection (3)(C)(iv) which states that "any failure to make a contribution under a schedule of contribution rates under this subsection shall be treated as a delinquent contribution under section 1145 of this title and shall be enforceable as such". This provision would not have been necessary if rehabilitation plan payments arose under CBAs.

The MPRA clarified existing law and did not repeal prior law.

**5**

**AMPT's contentions**

Adoption of the preferred or default schedules is the result of bargaining. The parties can either adopt the default schedule, which may preserve pension benefits but at a higher cost to the employer or the preferred schedule, which results in pension cuts but is of a lesser cost to the employer. If the preferred schedule is adopted, it always is embodied in a CBA. Accordingly, the preferred schedule "arises under" the CBA.

The Ninth Circuit has held that an employer is obligated by the National Labor Relations Act (NLRA) to bargain over rehabilitation plan contribution rates, thereby confirming that the resulting rate schedule arises from the CBA rather than the statutory provisions of the PPA.

Peninsula has representatives who serve on the board of AMPT, as it was permitted to do so under the CBAs, and therefore has the ability to influence the terms of the rehabilitation plan, thus belying its argument that it has no say in the plan's terms.

The MPRA changed the law and since the payments in dispute herein were due prior to the effective date of the MPRA, they should not be "disregarded in determining the allocation of unfunded vested benefits to an employer". This position is confirmed by proposed regulations of the Pension Benefit Guaranty Corporation (PBGC).

Peninsula's reliance on decisions by the Third Circuit and the District Court of Oregon holding that statutory surcharges cannot be considered in determining an employer's highest contribution rate is misplaced because there is an important distinction between the surcharges imposed by statute and subsequently negotiated contributions arising out of a CBA.

**Opinion**

The outcome of this dispute depends on whether Peninsula's obligation to contribute "arises" under the CBA. If it does, then AMPT prevails. If it does not, Peninsula prevails.

The term "arise" ordinarily means "originating from", "having its origin in," "growing out of" or "flowing from". *Underwriters of Lloyd's of London v. Cordova Airlines, Inc.,* 283 F. 2d 659 664 (9th Cir.1960); *Continental Casualty Co. v. City of Richmond,* 763 F. 2d 1076, 1080 (9th Cir. 1985); *Pension Trust Fund v. Federal Insurance Co.,* 307 F. 3d 944, 952 (9th Cir. 2002); *United States ex. rel. Welch v. My Left Children's Therapy,* 871 F. 3d 791, 798 (9th Cir. 2017).

29 U.S.C. 1145 provides that every employer who is obligated to make contributions "under the terms of a CBA" shall make such payments in accordance with the terms of the CBA. Thus, if Peninsula's obligation to contribute arises under the CBA it has a contractual obligation *under the terms of the CBA* to pay a sum that includes the preferred schedule contribution rate to AMPT during the period that it is contributing to the fund. But if Peninsula's obligation to contribute does not arise under the CBA, then its obligation to contribute is non-contractual because it stems from a source other than the CBA. In such instance, Section

6

1145 would not ordinarily apply because it only applies to contractual obligations, not non-contractual obligations. *Laborers Health & Welfare Trust Fund for Northern California v. Advanced Lightweight Concrete, Inc..* 484 U.S. 539, 546 (1988).

When the PPA was enacted, it provided in Section 1085(e) (3) (c) (iv) that any failure to make a contribution under its terms would be considered as a delinquent contribution under Section 1145. This suggests that Congress believed that the obligation to contribute under the PPA was a non-contractual obligation. If it were a contractual obligation, then there would have no need to enact this subsection because enforcement of the obligation would already have been covered by Section 1145.

Section 1085(e) (7) imposes an automatic surcharge on employers of 5% of the contributions otherwise required under a CBA in the initial year that a fund is in critical status. The surcharge rises to 10% in subsequent years, but is terminated once the employer and the bargaining unit enter into a new CBA that contains one of the payment schedules adopted by a fund. Subsection 7(B) contains an enforcement mechanism similar to Section 1085(e) (3) (iv), to wit, a failure to make a contribution would be considered as a delinquent contribution under Section 1145.

In *Board of Trustees of IBT Local 863 Pension Fund v. C&S Wholesale Grocers, Inc.,* 802 F. 3d 534 (3rd Cir. 2015) (*C&S*), the fund argued that the surcharge should be included in computing the employer's highest contribution rate determining its obligation to contribute. The Court rejected this argument, holding that surcharges were non-contractual obligations created by Section 1085(e)(7) and not within the scope of Section 1145, which was precisely why subsection 7(B) was necessary to ensure the payment of delinquent contributions . *Id.* at p. 543.

*C&S* was followed by *Board of Trustees of the Western States Office and Professional Employees v. Welfare and Pension Fund Administrative Service, Inc.,* 2020 US Dist LEXIS 87947 (D. Ore. 2020)(*WPAS*), wherein the Court rejected a similar argument by a fund, holding:

"Had Congress not enacted the PPA in 2006 and imposed a surcharge on an employer when a plan reaches 'critical status,' as defined by the PPA, WPAS would not have incurred a surcharge based solely on its status as a contributing employer under the CBA. In summary, the Court concludes that WPAS's obligation to pay the PPA surcharge did not arise under its CBA."

AMPT notes that both *C&S* and *WPAS* involved surcharges that were not recorded in a CBA and that this is a critical difference. Although AMPT's position is not unreasonable, the fact is that both the surcharges and the default and preferred schedules have the same enforcement mechanism and stem from the same statutory scheme and, as the *WPAS* court points out, these obligations would not have arisen "had Congress not enacted the PPA in 2006". Default schedules are often not included in CBAs. The parties agree that such default schedules need not be included in an employer's obligation to contribute. But it is possible that a default schedule would be included in a CBA, particularly where a fund only presents

7

a single schedule to an employer. Under AMPT's interpretation of the PPA, inclusion of the default schedule in a CBA permits a fund to include the default schedule rate as part of the highest contribution rate. It makes no sense to consider default schedules differently, based on the happenstance that the default schedule is contained in a CBA in one case, but not in another.

Collective bargaining is the result of employers and employee representatives meeting to consult and bargain in a good faith effort to reach agreement with respect to the conditions of employment affecting the employees. *U.S. Department of Health and Human Services v. Federal Labor Relations Authority,* 833 F. 2d 1129, 1131-32 (4th Cir. 1987); 5 USC 7103(a)(12).. AMPT argues that adoption of the preferred schedule was the result of such bargaining.[5] But such "bargaining" is not the type of bargaining envisioned under the NLRA because neither the employer nor the union representatives have any control over the terms of this particular element of their negotiations. As I observed in *International Brotherhood of Electrical Workers Local 483 v. Western States Office and Professional Employees Pension Fund,* AAA Case No. 01-18-0004-3947 (January 6, 2020):

"The Fund argues in its brief that the parties can in fact negotiate the terms of a supplemental schedule.  This argument fails. If the parties agree to a schedule different from the schedule set forth in the rehabilitation plan, they cannot insert these new terms into the CBA at that point. Presumably, the Fund is arguing that once the employer and the union decide to modify the terms of the rehabilitation plan, the administrator of the pension plan must amend the rehabilitation plan. But that is not the case and the Fund's argument cements the point that the federal statute is the source of the obligation to contribute. In other words, the employer and the union can bargain to their hearts' content the terms of a supplemental schedule, but it is a third party---a fund---that makes the final determination. And the third party's power stems from a federal statute, not the CBA."

AMPT asserts that the Ninth Circuit, in *Delta Sandblasting Co., Inc. v. National Labor Relations Board,* 969 F. 3d 957 (9th Cir. 2020) has held that the preferred schedule arises from a CBA rather than the statutory provisions of the PPA. However, AMPT misinterprets that case. Delta entered into a CBA with a union wherein it agreed to contribute to the union's pension fund at a rate of $1.95 and also pay the preferred schedule rate imposed by the fund because it was in critical status. Delta adhered to this arrangement until two months after the CBA expired. At that point, it wrote a letter to the union advising it that it would no longer pay the preferred schedule rate because it did not have the money. It then unilaterally ceased paying that rate but continued to pay the base $1.95 rate. The National Labor Relations Board found that Delta's act was an unfair labor practice. Delta appealed. The basis of the appeal was that Section 302 of the Labor Management Relations Act (LMRA) required a written agreement to enforce an obligation to pay pension contributions. The Ninth Circuit affirmed. It held that

8

---

[5] AMPT also argues that another "bargaining" option was to completely withdraw from the fund. See *Trustees of Local 138 Pension Trust Fund v. F.W. Honerkamp Co., Inc.* 692 F. 3d 127 (2nd Cir. 2012).

while the LMRA prohibited payments by employers to unions, that general prohibition was subject to several exceptions, including pension contributions to a trust fund. The Court noted that the CBA obligated Delta to make contributions to the pension fund and that Delta did not withdraw from the fund and so this was not a withdrawal liability case. Delta merely chose to reduce the contribution that it was required to make to the fund. The contractual liability imposed on Delta and discussed by the Court was a duty owed by Delta *to the union* to pay both the bargained rate and the preferred schedule rate to the fund. The issue in this case is the duty owed by Peninsula *to the fund* to make payments to it as a consequence of Peninsula's decision to withdraw from the fund. That duty stems from a federal statute, not the contract (CBA) entered into between Peninsula and Local 289. That federal statute obligates Peninsula to make contributions "arising under" a CBA, not contributions "set forth" or "contained" in a CBA.

The source of the obligation to contribute was also discussed in *Bakery & Confectionary Union & Industrial International Pension Fund v. Just Born II, Inc.,* 888 F. 3d 696 (4th Cir. 2018). After the fund entered critical status, Just Born and the union entered into a CBA adopting one of the fund's rehabilitation plan schedules. When the parties were negotiating a renewal of the CBA, Just Born proposed that new employees not be required to contribute to the fund and instead be allowed to contribute to a 401k plan. The union rejected the proposal. When the CBA expired, Just Born declared an impasse, contributed to the fund only on behalf of existing employees, ceased contributing to the fund on behalf of new employees, and instead opened 401k accounts for them. Thus, Just Born neither withdrew from the fund nor entered into a new CBA implementing one of the fund's rehabilitation schedules, as it was required to do if it did not withdraw. The fund sued Just Born, alleging that it had a continued obligation to contribute to the fund on behalf of all employees, not just the employees covered by the expired CBA. The District Court ruled in favor of the fund and Just Born appealed. It argued that the District Court's decision denied its right to declare an impasse. The Fourth Circuit disagreed and affirmed, holding: (at p. 704)

But this principle [the right to declare an impasse] describes Just Born's obligations and rights only when negotiating with the Union. Just Born's obligations to the Pension Fund arise from a different authority: ERISA, including the PPA. The Provision, as part of the PPA, is a separate and independent statutory requirement under ERISA, distinct from the collective bargaining process between an employer and union.

AMPT also argues that enactment of the MPRA in 2014 supports its position because the statute states that it was effective after December 31, 2014.[6]  Thus, the law was different prior to that date, i.e., default and preferred rate schedules could not be "disregarded" when assessing the highest contribution rate. However, statutes do not always create new law. They can clarify existing law. The MPRA was enacted just before *C&S* was decided and the court declined to hold that the statute created new law, stating: (at p. 546)

---

[6] The payments at issue here were imposed prior to December 31, 2014.

Here, because of the dearth of legislative history for the MPRA and lack of clear statutory language, it would be a hazardous venture for us to draw any conclusions from the enactment of the MPRA. The Board argues that the Congress that enacted the MPRA included an effective date provision because it interpreted Section 1085(e)(9)(B) as *not* excluding surcharges from Section 1399(c)(1)(C)(i)(II)'s 'highest contribution rate.' Despite the Board's arguments, 'it [remains] the function of the courts and not the Legislature ...to say what an enacted statute means.' *Pierce v. Underwood,* 487 U.S. 552, 566, 108 S.Ct. 2541, 101 L.Ed. 2d. 490 (1988)"

AMPT states that the PBGC has recently provided the interpretative guidance that the Third Circuit was seeking. Its proposed regulations purportedly confirm that the MPRA was a change in the law. See *Methods for Computing Withdrawal Liability, Multiemployer Pension Reform Act of 2014,* 84 Fed. Reg. 2075 (proposed February 6, 2019). PBGC regulations deserve great weight but the cited provision has only been proposed, it has not been adopted. And so, even if one reads the proposal as a determination that the MPRA changed the law, it is not known why the provision has not been adopted and so, at this juncture, it cannot be considered. Further, the Third Circuit decision in *C&S* is entitled to substantial weight, given that it is the only Court of Appeal decision regarding this issue.

AMPT also cites four arbitration awards[7], three of which were rendered after my interim award in *IBEW,* where the arbitrators found that the preferred schedule rate arose from the CBA. I know all four arbitrators quite well and have a high regard for them. However, none of these awards considered that Section 1085(e)(3)(C) would be unnecessary and redundant if the preferred schedule arose under a CBA. Nor did the awards give any weight to the only Court of Appeal decision that stated that the MPRA clarified, rather than repealed, prior law.

AMPT's final argument is that Peninsula did have a say in the sums contained in the preferred schedule because it had representatives on AMPT's board who presumably could have lobbied for rates that were palatable to Peninsula. This undoubtedly is not a serious argument because it is hornbook law that trustees have a fiduciary duty to the trust and if Peninsula's representatives put Peninsula's interests ahead of the trust, they would have breached that fiduciary duty.

**Attorney Fees and Costs**

Peninsula's demand for arbitration included a demand for attorney fees and costs should it prevail. The relevant statutes do not provide for attorney fees for a prevailing party and I

10

---

[7] *Local 26 Educational Development Trust v. Western States Office and Professional Employees Pension Fund* (December 26, 2019)(Thomas Brewer, arbitrator); *Jim Fugate Ford, Inc. v. Automotive Machinists Pension Trust* (May 13, 2019)(Norman Brand, arbitrator); *International Association of Sheet Metal, Air, Rail, and Transportation Workers* (May 25, 2020)(Bruce E. Meyerson, arbitrator); *Seattle Area Plumbing & Pipefitting Industry Journeymen and Apprentice Training Trust v. Western States Office and Professional Employees Pension Fund* (February 18, 2020)(Richard R. Mainland, arbitrator).

find that AMPT defended this matter in good faith. Hence, the request for attorney fees and costs is denied.

**Disposition**

The inclusion by the Fund of the preferred schedule contribution rate to determine Peninsula's withdrawal liability was not authorized by ERISA. AMPT is directed to recalculate Peninsula's withdrawal liability without consideration of a rate based on the preferred schedule and return all overpayments to Peninsula within thirty calendar days after issuance of this Final Award (or on a date mutually agreed upon by the parties). Interest on such sum shall be paid at the rate of maximum statutory interest rate in the State of Washington.   AMPT shall also determine the future quarterly payment to be made by Peninsula based on the revised calculation of Peninsula's withdrawal liability.

The administrative fees and expenses of the American Arbitration Association totaling $3,350.00 and the compensation and expenses of the arbitrator totaling $14,820.00 shall be borne as incurred.

This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims not expressly granted herein are hereby, denied.

Dated: December 22, 2020

Paul J. Dubow
Arbitrator

11



**EXHIBIT B**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **BOARD OF TRUSTEES OF THE WESTERN STATES OFFICE AND PROFESSIONAL EMPLOYEES PENSION FUND**, | Case No. 3:20-cv-00156-IM (Lead Case) |
| Plaintiff, | |
| v. | Case No. 3:20-cv-00309-IM (Member Case) |
| **INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 483**, | **OPINION AND ORDER** |
| Defendant. | |
| **PACIFIC NORTHWEST IRONWORKERS AND EMPLOYERS APPRENTICESHIP AND TRAINING TRUST**, | |
| Plaintiff, | |
| v. | |
| **BOARD OF TRUSTEES OF THE WESTERN STATES OFFICE AND PROFESSIONAL EMPLOYEES PENSION FUND**, | |
| Defendant. | |

PAGE 1 – OPINION AND ORDER

Robert B. Miller, Kilmer, Voorhees & Laurick, P.C., 732 N.W. 19th Ave., Portland, Oregon, 97209. Attorney for the Fund.

Darian Stanford, Tonkon Torp LLP, 888 S.W. Fifth Avenue, Suite 1600, Portland, Oregon 97204, and Joseph A. Hamell, Montgomery Purdue Blankinship & Austin, PLLC, 5500 Columbia Center, 701 Fifth Avenue, Seattle, Washington 98104. Attorneys for Employers.

**IMMERGUT, District Judge.**

This consolidated matter comes before the Court on cross-motions for summary judgment.[1] ECF 23; ECF 27. The parties seek judicial review of two arbitration awards determining the proper calculation for withdrawal liability under the Employee Retirement Income Security Act ("ERISA"). The arbitrators considered the same legal question and reached opposite results. The narrow question presented is whether, when calculating annual payments for withdrawal liability from a multiemployer pension plan, the statutory formula—specifically, the "highest contribution rate at which an employer had an obligation to contribute" "arising under" a collective bargaining agreement ("CBA")—includes supplemental contribution rates in furtherance of a rehabilitation plan[2] which are adopted in a CBA.[3] 29 U.S.C. §§ 1392(a); 1399(c)(1)(C)(i)(II).

---

[1] For the sake of clarity, all citations to ECF docket numbers will refer to the docket submissions in the lead case, Docket No. 3:20-cv-156, except where otherwise specified.

[2] The parties agree that supplemental contribution rates adopted under a rehabilitation plan during years after the Multiemployer Pension Reform Act of 2014 ("MPRA") became effective are not included in this calculation. *See* 29 U.S.C. § 1085(g)(3)(A); ECF 1 at ¶ 13 (stating that Fund did not include rehabilitation contributions in its calculations for years after the MPRA became effective); ECF 23 at 14; *Bd. of Trs. of IBT Local 863 Pension Fund v. C&S Wholesale Grocers, Inc.*, 802 F.3d 534, 538 (3d Cir. 2015) ("This amendment does not affect the surcharges here as they accrued before December 31, 2014.").

[3] In addition to this narrow question, the parties sparsely brief the question of whether the supplemental contribution rates at issue might be included on another basis: as an "obligation to contribute arising" "as a result of a duty under applicable labor-management relations law." 29 U.S.C. § 1392(a). However, because the parties do not fully argue this issue and because this

PAGE 2 – OPINION AND ORDER

In Case No. 3:20-cv-00309-IM, Plaintiff Pacific Northwest Ironworkers and Employers Apprenticeship and Training Trust ("Ironworkers") sues the Board of Trustees of the Western States Office and Professional Employees Pension Fund ("Fund") to vacate the arbitrator's decision that the Ironworkers' rehabilitation contribution rates *are* included in the statutory formula that determines their withdrawal liability annual payment. Case No. 3:20-cv-309 ("20-309"), ECF 1 at ¶ 4. In Case No. 3:20-cv-00156-IM, the same Fund serves as Plaintiff, suing the International Brotherhood of Electrical Workers Local 483 ("IBEW") to vacate the arbitrator's decision that the IBEW's rehabilitation contribution rates are *not* included in the formula. ECF 1 at ¶ 15. The Ironworkers and IBEW are collectively referred to here as "Employers."

Oral argument was held on these cross-motions on October 30, 2020. ECF 33. As explained below, the Court concludes that the withdrawal liability formula includes those pre-MPRA rehabilitation contribution rates adopted in the CBA. Accordingly, the Court GRANTS the Fund's Motion for Summary Judgment, ECF 27, and DENIES the Employers' Motion for Summary Judgment, ECF 23. The Court affirms and enforces the Ironworkers Award and vacates the IBEW Award.

## FACTUAL AND PROCEDURAL BACKGROUND

IBEW and Ironworkers participated in the Western States Office and Professional Employees Pension Fund ("Fund"). ECF 13 at 2–3. The Fund is a multiemployer pension fund maintained and administered to provide retirement benefits to qualified labor employees. ECF 1 at ¶ 4. It is established and maintained pursuant to ERISA. *Id.*

---

Court does not need to reach this issue to rule on these cross-motions, the Court declines to address it.

PAGE 3 – OPINION AND ORDER

In 2009, the Fund "notified all participating employers," including both IBEW and Ironworkers, "that the Pension Fund was in critical status, that each participating employer was obligated to pay a statutory surcharge," and "that the Pension Fund had adopted a rehabilitation plan." ECF 1 at ¶ 7. The Fund "unilaterally adopted a rehabilitation plan" on October 16, 2009. ECF 1-1 at 3. The rehabilitation plan included two contribution schedules, one of which was designated the default schedule. ECF 26-2 at 431; ECF 23 at 15.

In and after 2010, the Ironworkers adopted a new CBA. 20-309, ECF 1 at ¶ 11. In and after 2010, IBEW adopted a new CBA. ECF 1 at ¶ 11. In these CBAs, the Employers "agreed to make supplemental contributions in order to contribute at a rate consistent with those published by the Pension Fund in furtherance of the rehabilitation plan." *Id.* at ¶ 12. *See also* 20-309, ECF 1 at ¶ 11 (describing these facts as paying the "rate required by the Rehabilitation Plan").

In 2014, Congress passed the Multiemployer Pension Reform Act ("MPRA"), which provided that "supplemental contribution rates for plan years beginning after December 31, 2014 were excluded from the highest contribution rate for the purpose of computing withdrawal liability under 29 U.S.C. § 1399(c)(1)(C)(i)." ECF 1 at ¶ 13.

On September 1, 2016, the Ironworkers withdrew from the Fund. 20-309, ECF 1 at ¶ 12. In 2016, IBEW also withdrew from the Fund. ECF 1 at ¶ 9. In its calculation of withdrawal liability for both Employers, the Fund included "the pre-MPRA supplemental contributions" included in the Employers' respective CBAs. *Id.* at ¶¶ 14–15. Both Employers disputed this inclusion within the withdrawal liability formula, and the parties proceeded to arbitration.

In IBEW's arbitration, the arbitrator concluded that the Fund erred by including the pre-MPRA rehabilitation contribution rates which were included in IBEW's CBA in its calculation of IBEW's withdrawal liability. *Id.* In the Ironworkers' arbitration, the arbitrator concluded that

PAGE 4 – OPINION AND ORDER

the Fund did not err by including these contribution rates. 20-309, ECF 1 at ¶ 18. In both matters,

the losing party appealed the arbitration award. The IBEW and Ironworkers cases are now

consolidated before this Court. *See* ECF 16.

## LEGAL STANDARDS

The Employee Retirement Income Security Act ("ERISA") authorizes judicial review "to

enforce, vacate, or modify the arbitrator's award." 29 U.S.C. § 1401(b)(2). The arbitrator's

findings of fact are presumed correct, *id.* at § 1401(c), but "the court may review *de novo* all

conclusions of law." *Trs. of Amalgamated Ins. Fund v. Geltman Indus., Inc*., 784 F.2d 926, 929

(9th Cir. 1986). "Statutory interpretation is a question of law subject to de novo review." *Id.*

## STATUTORY BACKGROUND

The Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"), 29 U.S.C.

§§ 1381–1461, amended ERISA to include mandatory liability for employers withdrawing from

established pension plans. *CMSH Co. v. Carpenters Tr. Fund for N. Cal.*, 963 F.2d 238, 239 (9th

Cir. 1992). If a dispute arises between the employer and the plan sponsor regarding a withdrawal

liability determination, the parties are required to resolve it through arbitration. 29 U.S.C.

§ 1401(a)(1).

The Pension Protection Act of 2006 ("PPA"), codified as amended throughout Chapter

26 and Chapter 29 U.S.C., "is designed to help severely underfunded multiemployer pension

plans recover." *Lehman v. Nelson*, 862 F.3d 1203, 1207 (9th Cir. 2017). "The law is far-

reaching, totaling approximately one thousand pages, and introduced a number of mechanisms

aimed at stabilizing pension plans and ensuring that they remain solvent." *Trs. of Local 138

Pension Tr. Fund v. F.W. Honerkamp Co.*, 692 F.3d 127, 130 (2d Cir. 2012). Among these

mechanisms are the rehabilitation plan and surcharge requirements. *Id.* at 130–31; *see also* 29

U.S.C. § 1085(e)(3) (rehabilitation plan); 29 U.S.C. § 1085(e)(7) (surcharge).

PAGE 5 – OPINION AND ORDER

In 2014, Congress further amended ERISA by passing the Multiemployer Pension

Reform Act ("MPRA"), which directs that "increase[s] in the contribution rate" that are made "in

order to enable the plan to meet the requirement of the . . . rehabilitation plan" are not to be

included in the calculation of "the highest contribution rate under section 1399(c)," which

determines withdrawal liability. 29 U.S.C. § 1085(g)(3)(A).

## A.  Entry into Critical Status and Enforcement

29 U.S.C. § 1085 provides "[a]dditional funding rules for multiemployer plans in

endangered status or critical status." For purposes of this matter, two relevant statutory

provisions are triggered when a plan enters critical status: (1) the rehabilitation plan requirement,

governed by 29 U.S.C. § 1085(e)(3); and (2) an automatic surcharge requirement, governed by

29 U.S.C. § 1085(e)(7).

### 1.  The Rehabilitation Plan

Upon a plan's entry into critical status, the plan sponsor is required to "adopt and

implement a rehabilitation plan" formulated "to enable the plan to cease to be in critical status by

the end of the rehabilitation period." 29 U.S.C. §§ 1085(a)(2)(A), (e)(3)(A)(i). A rehabilitation

plan includes, among other things, "options or a range of options to be proposed to the

bargaining parties" that will enable the plan to leave critical status. *Id.* at § 1085(e)(3)(A)(i).

"One schedule shall be designated as the default schedule." *Id.* at § 1085(e)(1)(B).

The process for implementing rehabilitation plans is as follows. "[W]ithin 30 days after

the [plan sponsor's] adoption of the rehabilitation plan," the sponsor "shall provide to the

bargaining parties 1 or more schedules showing revised benefit structures, revised contribution

structures, or both, which, if adopted, may reasonably be expected" to move the plan out of

critical status. *Id.* at § 1085(e)(1)(B). The plan sponsor "may . . . provide the bargaining parties

PAGE 6 – OPINION AND ORDER

with additional information." *Id.* When the CBA that was in effect when the fund enters critical

status expires, the parties have 180 days to bargain over which, if any, of these rehabilitation

schedules will be adopted in the next CBA. *Id.* at § 1085(e)(3)(C).

Section 1085(e)(3)(C) is titled "Imposition of schedule where failure to adopt

rehabilitation plan." *Id.* at § 1085(e)(3)(C). Under this provision, if the bargaining parties "fail to

adopt a contribution schedule with terms consistent with the rehabilitation plan and a schedule

from the plan sponsor" within the allotted time, "the plan sponsor shall implement the [default]

schedule." *Id.* at § 1085(e)(3)(C)(i). If a party fails to make a contribution under a section

1085(e)(3)(C)-imposed schedule, that obligation is enforced through section 1085(e)(3)(C)(iv).

This enforcement provision states, "Any failure to make a contribution under a schedule of

contribution rates provided under this subsection shall be treated as a delinquent contribution

under section 1145 of this title and shall be enforceable as such." *Id.* at § 1085(e)(3)(C)(iv).

"Section 1145" here refers to 29 U.S.C. § 1145, ERISA's enforcement provision that

predates the passage of the PPA. ERISA's enforcement provision, section 1145, provides,

"[e]very employer who is obligated to make contributions to a multiemployer plan under the

terms of the plan or under the terms of a collectively bargained agreement shall, to the extent not

inconsistent with law, make such contributions." 29 U.S.C. § 1145. Section 1145 "plainly

describes the employer's contractual obligation to make contributions but omits any reference to

a noncontractual obligation." *Laborers Health & Welfare Tr. Fund for N. Cal. v. Advanced*

*Lightweight Concrete Co., Inc.*, 484 U.S. 539, 546 (1988). Therefore, if (1) the bargaining parties

fail to adopt in their CBA a rehabilitation contribution rate that is consistent with the

rehabilitation plan and a provided schedule, and (2) a party then fails to make a contribution

under an imposed schedule, this non-CBA-imposed obligation is treated *as though* it is a

PAGE 7 – OPINION AND ORDER

"delinquent contribution" within section 1145, the enforcement provision that governs CBA obligations. 29 U.S.C. at § 1085(e)(3)(C)(iv); *see also id.* at § 1085(e)(3)(C)(i) (referring to the provision directing that one schedule "provide[d] to the bargaining parties" "shall be designated as the default schedule"); *id.* at § 1085(e)(1)(B) (that provision).

### 2.  The Automatic Employer Surcharge

Upon a fund's entry into critical status, in addition to the initiation of the rehabilitation plan process, an "[a]utomatic employer surcharge" is imposed on the employer. *Id.* at § 1085(e)(7)(A). This surcharge payment ends "beginning on the effective date of a [CBA] that includes terms consistent with [a plan sponsor-provided schedule]." *Id*. § 1085(e)(7)(C).

Compliance with the surcharge requirement is assured by the enforcement provision within section 1085(e)(7), which states that "[a]ny failure to make a surcharge payment shall be treated as a delinquent contribution under section 1145 of this title and shall be enforceable as such." *Id.* at § 1085(e)(7)(B). Thus, the PPA enforces this statutory obligation again by referencing ERISA's existing contractual-obligation enforcement provision, section 1145.

### B.  Withdrawal and Calculation of Withdrawal Liability

Under the MPPAA, "when an employer completely withdraws from a multiemployer pension plan, the employer incurs withdrawal liability that corresponds to the value of benefits in the plan that have vested and are attributable to its employees."[4] *Bd. of Trs. of IBT Local 863 Pension Fund v. C&S Wholesale Grocers, Inc.,* 802 F.3d 534, 537 (3d Cir. 2015); 29 U.S.C. § 1381. Employers may satisfy the withdrawal liability with a single payment of the sum or

---

[4] Employers state that withdrawal liability is incurred for withdrawal from an "underfunded plan," ECF 23 at 10, but it appears that the withdrawals liability applies whether or not the plan is underfunded. *See* 29 U.S.C. § 1381 ("If an employer withdraws from a multiemployer plan . . . ."); *CMSH*, 963 F.2d at 239 ("The [MPPAA] amended ERISA to include mandatory liability on employers withdrawing from established pension plans.").

PAGE 8 – OPINION AND ORDER

through annual payments. Annual payments are calculated using the "highest contribution rate at which the employer had an obligation to contribute under the plan during the 10 plan years ending with the plan year in which the withdrawal occurs." 29 U.S.C. § 1399(c)(1)(C)(i). For the purpose of this calculation, the MPPAA defines "Obligation to Contribute" under 29 U.S.C. § 1392(a) as:

> an obligation to contribute arising –
>
> (1) under one or more collective bargaining (or related) agreements, or
>
> (2) as a result of a duty under applicable labor-management relations law, but
>
> does not include an obligation to pay withdrawal liability under this section or to pay delinquent contributions.

In this case, the parties dispute whether supplemental contribution rates adopted in furtherance of the rehabilitation plan and included in a CBA constitute "an obligation to contribute arising" "under" a CBA. *Id.* at § 1392(a).[5]

## C. The MPRA

In 2014, Congress enacted the MPRA, which added to the PPA 29 U.S.C. § 1085(g)(3)(A). This statutory amendment explicitly excludes "increase[s] in the contribution rate" that are made "in order to enable the plan to meet the requirement of the . . . rehabilitation

---

[5] The parties also dispute in their cross-motions whether these rehabilitation contribution rates constitute "an obligation to contribute arising" "as a result of a duty under applicable labor-management relations law," 29 U.S.C. § 1392(a), though the parties do not spend nearly as much time on this question. *See* ECF 23 at 37–39; ECF 27 at 31; ECF 29 at 21; ECF 30 at 19. The Court declines to address this question because the basis for inclusion discussed in text—as an obligating arising under a CBA—provides a sufficient ground on which to resolve these cross-motions.

PAGE 9 – OPINION AND ORDER

plan" from the calculation of "the highest contribution rate under section 1399(c)," which

determines withdrawal liability. *Id.* This provision provides:

> Any increase in the contribution rate (or other increase in
> contribution requirements unless due to increased levels of work,
> employment, or periods for which compensation is provided) that
> is required or made in order to enable the plan to meet the
> requirement of the funding improvement plan or rehabilitation plan
> shall be disregarded in determining the allocation of unfunded
> vested benefits to an employer under section 1391 of this title and
> in determining the highest contribution rate under section 1399(c)
> of this title, except for purposes of determining the unfunded
> vested benefits attributable to an employer under section
> 1391(c)(4) of this title or a comparable method approved under
> section 1391(c)(5) of this title.

29 U.SC. § 1085(g)(3)(A). The Fund did not include rehabilitation contribution rates in its

calculations for years after the MPRA became effective. ECF 1 at ¶ 13-14. The MPRA

amendments "are likely not retroactive amendments," *Serv. Emps. Int'l Union Nat. Indus.*

*Pension Fund v. Jersey City Healthcare Providers*, *LLC*, 358 F. Supp. 3d 12, 21 (D.D.C. 2019),

and no party to these cross-motion suggests they are. *See note* 2. As such, the MPRA does not

govern the issue presented in this case, which concerns only pre-MPRA years' rehabilitation

contribution rates that are included in a CBA.[6]

## DISCUSSION

To calculate a withdrawal liability under § 1399, the Fund must use the "highest

contribution rate at which the employer had an obligation to contribute under the plan during the

10 plan years ending with the plan year in which the withdrawal occurs." 29 U.S.C.

§ 1399(c)(1)(C)(i). For this calculation, the term "obligation to contribute" means "an obligation

---

[6] Both the Fund and Employers make arguments regarding the MPRA through a
legislative history analysis, addressed below.

PAGE 10 – OPINION AND ORDER

to contribute arising – (1) under one or more collective bargaining (or related) agreements, or (2)

as a result of a duty under applicable labor-management relations law . . . ." *Id.* at § 1392(a).

## A.  Arising Under the CBAs

The Employers contend that the statute's plain language, the interpretive canon that all

provisions of a statute must be given effect, and persuasive precedent support the conclusion that

pre-MPRA rehabilitation contribution rates adopted in a CBA are not an "obligation to

contribute" arising under a CBA for purposes of calculating withdrawal liability. *See* ECF 23 at

19–25.

### 1.  Plain Meaning of "Arising"

Whether rehabilitation contribution rates that are adopted in a CBA arise under the CBA

for purposes of calculating ERISA withdrawal liability is a question of first impression in the

Ninth Circuit. *See* ECF 30 at 20.

"To determine the meaning of a term in a federal regulation, we look to the common

meaning of the word." *Cleveland v. City of Los Angeles*, 420 F.3d 981, 989 (9th Cir. 2005).

Employers explain that in this Circuit, "arise" is "understood to mean originating from, having

its origin in, growing out of or flowing from." ECF 23 at 25 (quoting *United States ex rel. Welch*

*v. My Left Foot Child.'s Therapy, LLC*, 871 F.3d 791, 798 (9th Cir. 2017)); *see also Trs. of W.*

*States Office & Pro. Emps. Pension Fund v. Welfare & Pension Admin. Serv., Inc.*, No. 3:19-cv-

00811-SB, 2020 WL 2545315, at *5–6 (D. Or. May 19, 2020) (describing similar definitions

used by courts such as "come into being," "originate," and "spring up").

The Employers draw a distinction between (1) the origin of the rehabilitation contribution

rates that are adopted in the CBA, and (2) the collective bargaining process. They argue that the

"rehabilitation plan supplemental contributions cannot fall within [the definition of collective

bargaining] because they were never subject to 'negotiation' by the bargaining parties." ECF 23

PAGE 11 – OPINION AND ORDER

at 26 (emphasis omitted). They argue that the rehabilitation contributions are "[l]ike the surcharge," because "employers have no opportunity to bargain down the rates, or raise the rates in exchange for other concessions. If there is no opportunity to bargain over the level of rates, they by definition cannot 'originate from' the collective bargaining process or a CBA." ECF 29 at 7.

However, an inability to "bargain down the rates" does not mean that the adoption of a given rehabilitation contribution schedule within the CBA was not negotiated. As every relevant provision to the process for implementing and enforcing the rehabilitation plan shows, the inclusion of a given rehabilitation contribution rate *is* subject to negotiation during collective bargaining.

After a pension fund enters critical status, an employer has choices as to rehabilitation contribution rates. 29 U.S.C. § 1085(e)(3)(A) explains that a rehabilitation plan is a proposal that sets out "a range of options ***to be proposed*** to the bargaining parties . . . to enable the plan to cease to be in critical status . . . ***if agreed to*** by the bargaining parties" (emphasis added). 29 U.S.C. § 1085(e)(1)(B)(i) explains that the various rehabilitation schedules "provide[d] to the bargaining parties," "if adopted," should each "reasonably be expected to" help the plan "emerge from critical status." As such, the statutory language referring to the rehabilitation plan process explicitly states that none of the plan sponsor-provided schedules are *required* to be included in a post-critical status CBA, and repeatedly refers to "bargaining parties." Only if the bargaining parties "adopt" or "agree[] to" any of the proposals does inclusion of a rehabilitation contribution schedule in a CBA occur.

The statute also includes a provision titled "Imposition of schedule where failure to adopt rehabilitation plan." 29 U.S.C. § 1085(e)(3)(C). This provision provides for the situation where,

PAGE 12 – OPINION AND ORDER

"after receiving one or more schedules from the plan sponsor . . . the bargaining parties . . . ***fail to adopt*** a contribution schedule with terms consistent with the rehabilitation plan." *Id.* at § 1085(e)(3)(C)(i)(II) (emphasis added). Not only are the schedules proposed for potential "adoption," but the statute anticipates that the Employers might *not choose* to adopt a plan sponsor-provided schedule in the CBA.

Further, the statutory language repeatedly refers to the post-critical status, newly negotiated CBA as potentially "consistent" or "in accordance" with the plan sponsor's rehabilitation plan and provided schedule. *See, e.g.,* 29 U.S.C. § 1085(e)(3)(C)(i)(II) ("fail to adopt a contribution schedule with terms consistent with the rehabilitation plan and a schedule from the plan sponsor"); 29 U.S.C. § 1085(e)(3)(C)(ii)(I) ("a [CBA] providing for contributions under a multiemployer plan in accordance with a schedule provided by the plan sponsor pursuant to a rehabilitation plan"); 29 U.S.C. § 1085(e)(3)(C)(ii)(II) ("fail to adopt a contribution schedule with terms consistent with the updated rehabilitation plan and a schedule from the plan sponsor"). The text of 29 U.S.C. § 1085(e) demonstrates that the parties have choices and that the inclusion of rehabilitation contribution rates in a CBA is subject to bargaining. The statutory language recognizes the distinction between negotiated inclusion of rehabilitation contribution rates and unilaterally imposed rates. A rehabilitation contribution rate adopted in a CBA therefore "originates from" those negotiations, and thus from the CBA.

## 2. Precedent

There is limited case law interpreting the "obligation to contribute" provision. Employers seek to draw an analogy between this case and *Board of Trustees of IBT Local 863 Pension Fund v. C&S Wholesale Grocers, Inc.*, 802 F.3d 534 (3d Cir. 2015). In that case, as here, a pension fund entered critical status. As explained above, when a fund enters critical status, the plan sponsor must "adopt and implement a rehabilitation plan." *Id.* at 538. However, *C&S* focused on

PAGE 13 – OPINION AND ORDER

another consequence of entry into critical status: the automatic surcharge. "[T]he PPA imposes

an automatic surcharge from 30 days after the employer has been notified that the plan is in

critical status until the adoption of a new CBA in accordance with the rehabilitation plan." *Id.* In

*C&S*, the pension fund included that surcharge in its calculation of the withdrawal liability, and

the Third Circuit found this inclusion incorrect as a matter of law. It explained that the

surcharge's enforcement provision, 29 U.S.C. § 1085(e)(7)(B), is necessary because "surcharges

are noncontractual obligations created by Section 1085(e)(7), [and] they are not within the scope

of Section 1145," the enforcement provision for CBA obligations. *Id.* at 543. *C&S* also stated

that "[i]n order to give effect to Section 1085(e)(7)(B) [the surcharge enforcement provision],"

the surcharge cannot "arise under the CBAs." *Id.* at 544. The Third Circuit further explained that

the surcharge cannot be included in the withdrawal liability calculation "unless it is part of the

highest contribution *rate*." *Id.* at 544 (emphasis in original).

Employers argue that *C&S* determines the outcome of this case, ECF 23 at 23–25, but

*C&S* is distinguishable on multiple grounds. First, unlike a surcharge, a rehabilitation

contribution rate is clearly a "rate" capable of inclusion within the withdrawal liability

calculation. Second, the surcharge is a statutorily mandated payment that occurs automatically

upon a fund's entering critical status rather than a negotiated contribution rate adopted in a CBA.

In this case, the post-critical status CBA explicitly includes a rehabilitation contribution rate

when the Employers had the choice not to include it. Unlike with the statutorily mandated

surcharge, the parties in this case could have included the rehabilitation contribution rate within

the CBA, not included it and accepted the default rate, or withdrawn from the Fund. Given those

options, the Employers agreed to a new CBA that included a rehabilitation contribution rate.

Third, the *C&S* court's concern about giving effect to all statutory provisions is not

PAGE 14 – OPINION AND ORDER

determinative here. Unlike with the automatic surcharge, there are multiple rehabilitation

schedules. The fact that *contractual* obligations to pay rehabilitation contributions are enforced

under section 1145 does not render section 1085(e)(3)(C)(iv) meaningless. Section

1085(e)(3)(C)(iv) continues to be a necessary mechanism to enforce noncontractual

rehabilitation contributions imposed by law under section 1085(e)(3)(C). This Court accepts that

*some* rehabilitation contribution rates do not arise under a CBA, but some do—including the

ones at issue in this case. As such, Employers go too far here in arguing that *C&S* "confirms"

that "rehabilitation plan contribution rates must be excluded from withdrawal liability

payments." ECF 23 at 23.

The same issue exists with Employers' reliance on *Trustees of Western States Office and

Professional Employees Pension Fund v. Welfare & Pension Administration Service, Inc.

("WPAS")*, No. 3:19-cv-00811-SB, 2020 WL 2545315 (D. Or. May 19, 2020). *See* ECF 23 at

30–31. *WPAS* does not address the precise question presented in this case. That case, like *C&S*,

addressed only the "10 percent surcharge that the PPA imposes on an employer as a result of the

plan reaching critical status," rather than rehabilitation contribution rates included in a CBA.

*WPAS*, 2020 WL 2545315, at *5 (quotations omitted). In *WPAS*, the court found the surcharge

was not properly included in the calculation of withdrawal liability because "[h]ad Congress not

enacted the PPA in 2006 and imposed a surcharge on an employer when a plan reaches 'critical

status,' as defined by the PPA, WPAS would not have incurred a surcharge based solely on its

status as a contributing employer under the CBA." *Id.* at *6. Here, however, the Employers are

not subject to a rehabilitation contribution rate included within their CBA solely by reason of

their being a contributing employer under a CBA. They are subject to it because they agreed,

PAGE 15 – OPINION AND ORDER

during negotiations subsequent to the plan's entry into critical status, to put a rehabilitation contribution rate in the new CBA.

The Employers' reliance on two arbitration decisions, *Domtar Corp. v. Pace Industry Union-Management Pension Fund*, ECF 25-1, and *Commencement Bay Corrugated, Inc. (CBC) v. Pace Industry Union-Management Pension Fund*, ECF 25-2, is similarly unavailing. *See* ECF 23 at 31. Although those decisions concluded that certain rehabilitation contribution rates should not have been included in withdrawal liability calculations, the rehabilitation contribution rates at issue in those arbitrations were not included in the CBAs. As the Ironworkers arbitrator explained, "those cases address the different question of whether contribution increases, imposed by law pursuant to 29 U.S.C. § 1085(e)(3)(C) following expiration of the parties' collective bargaining agreement, should be included in the calculation." ECF 26-2 at 439. In *Domtar*, the rehabilitation contribution rates at issue were "imposed by operation of law after the Employer's Agreement with the Union expired and a new Agreement complying with scheduled increases set forth in the default schedule of the Rehabilitation Plan[] was not adopted." ECF 25-1 at 36. These rehabilitation contributions "were not agreed upon in any [CBA] or related agreement. Instead, they were implemented under a Rehabilitation Plan issued, unilaterally, by the Fund." *Id.* at 53; *see also* ECF 25-2 at 10 (*CBC*).

In contrast, at issue here is a rehabilitation contribution rate that was expressly adopted in a CBA, not one imposed by law under section 1085(e)(3)(C). *See* ECF 26-2 at 439 (Ironworkers arbitrator explaining "*Domtar* and *CBC* . . . are inapposite here" because, "[i]n the language of the *C & S* court, neither *Domtar* nor *CBC* involved contribution rates . . . set by CBA's . . .") (internal quotation marks omitted). In sum, the decisions cited by Employers, *see* ECF 23 at 31; ECF 29 at 11–13, do not undercut, but rather reinforce, the conclusion that a rehabilitation

PAGE 16 – OPINION AND ORDER

contribution rate adopted in a CBA is an obligation to contribute arising under that CBA, and therefore should be included when calculating withdrawal liability.

Most adjudications which address the precise question presented to this Court—whether pre-MPRA rehabilitation contribution rates *recorded in the CBA* should be included when calculating annual payments for withdrawal liability based on obligations arising under a CBA— conclude that these rates should be included.[7] In *Seattle Area Plumbing & Pipefitting Industry Journeyman & Apprentice Training Trust (SAPP) v. Western States Office and Professional Employees Pension Fund*, ECF 28-2, the arbitrator rejected the same arguments that Employers bring here. *See* ECF 28-2 at 9-10. The *SAPP* arbitrator explained:

> There is some force in SAPP's argument that 'arising out of' means more than simply 'contained in.' For example, if ERISA provided that an employer who remains in a pension plan in critical status *must* enter into a collective bargaining agreement providing for contribution rates consistent with the supplemental schedules in the rehabilitation plan, it could justifiably be argued that the 'obligation to contribute' arose out of the statute, not the CBA. . . . [W]hile Section 1085(e) imposes obligations on the *Fund* to adopt a rehabilitation plan and provide schedules of contribution rates, **it does not contain any provision requiring the bargaining parties to adopt those rates in their CBAs**. Under the statutory scheme, upon receiving the Fund's rehabilitation plan and schedules, SAPP had several options.

*Id*. at 9 (emphasis added). The *SAPP* arbitrator went on to discredit the employer's argument that "the statutory *limits* on its freedom to bargain for contribution rates means that the supplement schedules' rate did not 'arise out of' the CBA . . . . [L]ack of complete freedom to select contribution rates in its CBAs (without incurring statutory surcharges) does not, in my opinion,

---

[7] See ECF 1 at ¶ 16 ("The Arbitrator's Award [in *IBEW*] is unprecedented.").

PAGE 17 – OPINION AND ORDER

mean that the supplement schedules agreed to in SAPP's CBA did not 'arise out of' those

CBAs." *Id.* at 10 (emphasis in original). This Court agrees.

As the SAPP arbitrator explained, the Employers "had several options." ECF 28-2 at 9.

They could, of course, exit the Fund. But they could also stay in the Fund and choose between

rehabilitation contribution rate options that the plan sponsor was statutorily required to "provide

to the bargaining parties" and "which, if adopted, may reasonably be expected to enable the

multiemployer plan to emerge from critical status." 29 U.S.C. § 1085(e)(1)(B)(i). They could

choose not to "adopt a contribution schedule with terms consistent with the rehabilitation plan

and a schedule from the plan sponsor," thereby triggering imposition of one of the sponsor's

provided schedules, designated as the default, instead. *Id.* at § 1085(e)(3)(C). As detailed more

below, section 1085(e) consistently characterizes post-critical status decision-making regarding

rehabilitation schedules as bargaining and as a process in which the employers have choices. *See*

*also Honerkamp,* 692 F.3d at 132 (describing how a "rehabilitation plan would figure

prominently in any negotiations" and how negotiating parties "considered the rehabilitation

plan's schedules as well as the possibility of [the employer's] withdrawal" from the fund). The

"lack of complete freedom" to choose what levels of rates might be included in the CBA does

not mean that a "bargaining part[y]" did not negotiate. ECF 28-2 at 9-10.

### 3. Giving Effect to All Statutory Provisions

Employers argue that rehabilitation contribution rates cannot "arise" from a CBA because

so holding would render the provision that enforces the schedules imposed under section

1085(e)(3)(C), section 1085(e)(3)(C)(iv), meaningless. ECF 23 at 21–23. "[O]ne of the most

basic interpretive canons [is] that '[a] statute should be construed so that effect is given to all its

provisions, so that no part will be inoperative or superfluous, void or insignificant . . . .'" *Corley*

*v. United States*, 556 U.S. 303, 314 (2009) (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)).

PAGE 18 – OPINION AND ORDER

Indeed, the Supreme Court has been "hesitant to adopt an interpretation of a congressional enactment which renders superfluous another portion of that same law." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 185 (2011) (quoting *Mackey v. Lanier Collection Agency & Service, Inc.*, 486 U.S. 825, 837 (1988)).

However, because section 1085(e)(3)(C)(iv) is properly read as enforcing noncontractual, section 1085(e)(3)(C)-imposed rehabilitation contribution rates while section 1145 enforces contractual ones, no portion of the statute is superfluous. Employers argue that section 1085(e)(3)(C)(iv) enforces all rehabilitation contribution rates, regardless of whether they have been contractually adopted in a CBA or were imposed by law under section 1085(e)(3)(C). ECF 23 at 24-25. Section 1085(e)(3)(C)(iv) states, "Any failure to make a contribution under a schedule of contribution rates provided under this subsection shall be treated as a delinquent contribution under section 1145 of this title and shall be enforceable as such." The plain language of section 1085(e)(3)(C)(iv), and its structural location within section 1085(e)(3)(C), which details the procedures imposing a schedule by law after a failure to adopt, make clear that the enforcement provision applies where the parties have not adopted a CBA. This Court agrees with the Ironworkers arbitrator, who distinguished between contribution increases "imposed by law pursuant to [section] 1085(e)(3)(C)" and those "set by CBA's." ECF 26-2 at 439. The enforcement provision within section 1085(e)(3)(C) thus does not enforce all rehabilitation plan contributions without distinction, as Employers claim.

While *contractual* contribution rate obligations are enforced through section 1145, section 1085(e)(3)(C)(iv) remains necessary to enforce *noncontractual* contribution rate obligations imposed under section 1085(e)(3)(C). Further, all the statutory terms defining and outlining the rehabilitation process throughout section 1085(e) make it clear that the inclusion of

PAGE 19 – OPINION AND ORDER

a rehabilitation schedule is subject to bargaining. *See, e.g.,* 29 U.S.C. § 1085(e)(1) (plan sponsor

"shall provide to the bargaining parties 1 or more schedules . . . which, if adopted, may" help);

29 U.S.C. § 1085(e)(3) (describing a rehabilitation plan as including "options or a range of

options to be proposed to the bargaining parties"); 29 U.S.C. § 1085(e)(3)(B)(iii) (limiting the

ability to change any "schedule of contribution rates provided by the plan sponsor and relied

upon by bargaining parties in negotiating" a CBA); 29 U.S.C. § 1085(e)(3)(C)(i)(II) (describing

consequences if "the bargaining parties . . . fail to adopt a contribution schedule with terms

consistent . . ."); *see also Honerkamp,* 692 F.3d at 132 (describing how a "rehabilitation plan

would figure prominently in any negotiations" and how negotiating parties "considered the

rehabilitation plan's schedules as well as the possibility of [the employer's] withdrawal" from

the fund). Accordingly, giving effect to all the words in the statute requires the conclusion that

rehabilitation contribution rates adopted in a CBA "arise under" that CBA for purposes of

calculating withdrawal liability.

### 4. Legislative History

The question posed in this case is limited to rehabilitation contribution rates in effect

before the effective date of the MPRA, a 2014 statutory amendment to the PPA. *See* ECF 1 at

¶ 15 (describing the issue as whether "the pre-MPRA supplemental contributions" could be

included in calculating withdrawal liability). The MPRA amendment excludes from withdrawal

liability calculations any "increase in the contribution rate (or other increase in contribution

requirements unless due to increased levels of work, employment, or periods for which

compensation is provided) that is required or made in order to enable the plan to meet the

requirement of the funding improvement plan or rehabilitation plan." 29 U.S.C. § 1085(g)(3)(A).

Employers argue that the MPRA amendments clarify the law, and thus rehabilitation

contribution rates adopted in a CBA were never intended by Congress to be included in

PAGE 20 – OPINION AND ORDER

calculating withdrawal liability. ECF 23 at 33. The Fund argues the MPRA amendments

"effected a substantive change in the law," excluding rehabilitation contribution rates adopted in

a CBA from withdrawal liability calculations going forward when the statute had not done so

before. ECF 27 at 24–25.

In statutory interpretation, "[w]here the statute's language is plain, the sole function of

the courts is to enforce it according to its terms.'" *Cleveland*, 420 F.3d at 989 (quoting *United*

*States v. Ron Pair Enters., Inc*., 489 U.S. 235, 241 (1989) (citations and quotations omitted).

"The inquiry must cease if the statutory language is unambiguous and 'the statutory scheme is

coherent and consistent.'" *Id*. (quoting *Ron Pair Enters*., 489 U.S. at 240).

Here, the statutory scheme as written before the 2014 amendment is coherent and

consistent, and the statutory language is unambiguous. As explained above, the statute's

treatment of the rehabilitation plan's implementation, the plan sponsor's obligations, the

bargaining parties' choices, and enforcement given those choices are coherent and consistent

across multiple subsections. Accordingly, this Court will "enforce it according to its terms." *Id.*

There is no need to wade into legislative history arguments.

Further, as the Third Circuit noted when faced with similar legislative history arguments

concerning the 2014 amendment in *C&S*, "the views of a subsequent Congress form a hazardous

basis for inferring the intent of an earlier one." *C&S*, 802 F.3d at 546 (quoting *Consumer Prod.*

*Safety Comm'n v. GTE Sylvania, Inc*., 447 U.S. 102, 117 (1980)) (internal quotation marks

omitted). The legislative history arguments in this case are no more compelling than the ones

rejected in *C&S*, and this Court accordingly finds no reason to engage in that "hazardous"

exercise.

PAGE 21 – OPINION AND ORDER

**CONCLUSION**

The Ironworkers arbitrator correctly determined that pre-MPRA rehabilitation contribution rates included in CBAs are included in withdrawal liability calculations. The IBEW arbitrator was incorrect to conclude otherwise. The Court GRANTS the Fund's Motion for Summary Judgment, ECF 27, and DENIES the Employers' Motion for Summary Judgment, ECF 23.

**IT IS SO ORDERED**.

DATED this 11th day of December, 2020.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge

PAGE 22 – OPINION AND ORDER

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF OREGON**

| | |
|---|---|
| **BOARD OF TRUSTEES OF THE WESTERN STATES OFFICE AND PROFESSIONAL EMPLOYEES PENSION FUND**, | Case No. 3:20-cv-00156-IM (Lead Case) |
| Plaintiff, | Case No. 3:20-cv-00309-IM (Member Case) |
| v. | **JUDGMENT** |
| **INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL 483**, | |
| Defendant. | |
| **PACIFIC NORTHWEST IRONWORKERS AND EMPLOYERS APPRENTICESHIP AND TRAINING TRUST**, | |
| Plaintiff, | |
| v. | |
| **BOARD OF TRUSTEES OF THE WESTERN STATES OFFICE AND PROFESSIONAL EMPLOYEES PENSION FUND**, | |
| Defendant. | |

Based on the Court's Opinion and Order, ECF 34, **IT IS ADJUDGED** that the Fund's Motion for Summary Judgment, ECF 27, is GRANTED, and the Employers' Motion for Summary Judgment, ECF 23, is DENIED.

DATED this 11th day of December, 2020.

/s/ Karin J. Immergut
Karin J. Immergut
United States District Judge

PAGE 2 – JUDGMENT