UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| BOARD OF TRUSTEES OF THE AUTOMOTIVE MACHINISTS PENSION TRUST,<br><br>Plaintiff,<br><br>v.<br><br>PENINSULA TRUCK LINES INC,<br><br>Defendant. | CASE NO. C21-64 MJP<br><br>ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT |

This matter comes before the Court on the Parties' Cross-Motions for Summary Judgment. (Dkt. Nos. 14, 16.) Having reviewed the Cross-Motions, the Responses (Dkt. Nos. 19, 20), the Supplemental Briefs (Dkt. Nos. 24, 25), and all supporting materials, the Court GRANTS Plaintiff's Motion and DENIES Defendant's Motion. The Court also finds this matter suitable for decision without oral argument, notwithstanding Defendant's request.

**BACKGROUND**

Plaintiff Board of Trustees of the Automotive Machinists Pension Trust ("Trustees") appeals an arbitration decision that it claims incorrectly calculated Defendant Peninsula Trucking Lines, Inc.'s ("Peninsula") liability for withdrawing from the Automotive Machinists Pension Trust ("Trust"). The Trustees argue that the arbitrator should have used a higher contribution rate to determine Peninsula's withdrawal liability. Peninsula disagrees. The Court reviews the relevant portion of the undisputed factual record and the applicable statutory framework.

The Trustees oversee the Trust, which is a collectively bargained multiemployer pension fund governed by ERISA. Unions rely on the Trust to hold pension benefits payable to their union members. One such union is the Local No. 289 of the International Association of Machinists and Aerospace Workers, AFL-CIO ("Union"), which negotiated a collective bargaining agreement (CBA) with Peninsula, a freight carrier in Federal Way. By at least 2011, Peninsula agreed to make monthly contributions to the Trust under the terms of CBA spanning 2010 to 2011. (See, e.g., Pl. Mot. Ex. D Art. 25 (Dkt. No. 16-1 at 41).) Peninsula negotiated two more CBAs, one covering the period from 2012 to 2015, and the other covering the period from 2015 to May 2018. (Pl. Mot. Exs. E and F (Dkt. No. 16-1 at 49-97).) But in 2018, Peninsula decided to withdraw from the CBA and terminate payments to the Trust.

Peninsula's decision to withdraw from the Trust triggered its "withdrawal liability" under ERISA, 29 U.S.C. § 1381, and the Multiemployer Pension Plan Amendments Act of 1980, 29 U.S.C. § 1399 ("MPPAA"). The MPPAA's imposition of withdrawal liability helps "to mitigate the incentives that employers would otherwise have to withdraw from multiemployer pension plans mired in financial difficulty." Bd. of Trustees of IBT Loc. 863 Pension Fund v. C & S

Wholesale Grocers, Inc., 802 F.3d 534, 536–37 (3d Cir. 2015) (citing Concrete Pipe & Prods. of Cal., Inc. v. Contr. Laborers Pension Tr. for S. Cal., 508 U.S. 602, 608–09 (1993)).

After receiving notice of Peninsula's withdrawal, the Trust calculated Peninsula's withdrawal liability to be $3,858,988—a figure Peninsula does not dispute. Consistent with ERISA, Peninsula desires to have the debt amortized through quarterly payments. See 29 U.S.C. § 1399(c)(1)(C). Herein lies the dispute. Although the parties agree on the formula to calculate the periodic payments, they disagree on the inputs.

Under ERISA the periodic payment of an employer's withdrawal liability is the product of two numbers. The first number, which is uncontested in this case, is "the average annual number of contribution base units" as calculated according to various ERISA provisions. 29 U.S.C. § 1399(c)(1)(C)(i)(I). This liability is "the employer's proportionate share of the plan's 'unfunded vested benefits,' calculated as the difference between the present value of vested benefits and the current value of the plan's assets." Pension Benefit Guar. Corp. v. R.A. Gray & Co., 467 U.S. 717, 725 (1984) (citing 29 U.S.C. §§ 1381 and 1391). The second number, which is disputed, is "the highest contribution rate at which the employer had an obligation to contribute under the plan during the 10 plan years ending with the plan year in which the withdrawal occurs." 29 U.S.C. § 1399(c)(1)(C)(i)(II).[1] The term "obligation to contribute" means "an obligation to contribute arising—(1) under one or more collective bargaining (or related) agreements. . . ." 29 U.S.C. § 1392(a).[2]

---

[1] An employer's obligation to make withdrawal liability payments is limited to 20 years, even if the entire withdrawal liability would not be amortized over that period. 29 U.S.C. § 1399(c)(1)(B).

[2] The Court also notes that after Congress amended ERISA in 2014 by passing the Multiemployer Pension Reform Act ("MPRA"), the law now excludes from the highest contribution rate calculation any "increase[s] in the contribution rate" that are made "in order to enable the plan to meet the requirement of the ... rehabilitation plan." 29 U.S.C. § 1085(g)(3)(A).

1       The parties dispute whether rehabilitation plan payments at rates set forth in the CBAs
2 should be considered "obligation[s] to contribute arising . . . under" the CBA. This requires some
3 understanding of the Trust's adoption of a rehabilitation plan in 2009. At that time, the Trust's
4 actuary certified that the Trust was in "critical status" due to a funding deficiency. (See Ex. A to
5 Pl. Mot. at 3 (Dkt. No. 16-1 at 3).) This meant that under the Pension Protection Act of 2006
6 ("PPA"), the Trust had to adopt a rehabilitation plan to help ensure it could meet its future
7 pension obligations. (Ex. A-4 to the Declaration of Jeremy Roller (Dkt. No. 15-1 at 75)); see 29
8 U.S.C. § 1085(b)(2); see also Lehman v. Nelson, 862 F.3d 1203, 1207 (9th Cir. 2017) (noting
9 that the PPA "is designed to help severely underfunded multiemployer pension plans recover").

10       Plans in "critical status" must notify the bargaining parties and adopt a plan that presents
11 one or more options for rehabilitation, such as reducing benefits or increasing contributions, to
12 enable the plan to emerge from critical status. 29 U.S.C. § 1085(e)(3)(A). The plan must include
13 "options or a range of options to be proposed to the bargaining parties . . . to enable the plan to
14 cease to be in critical status by the end of the rehabilitation period and may include . . . increases
15 in contributions, if agreed to by the bargaining parties. . . ." 29 U.S.C. § 1085(e)(3)(A)(i). Within
16 30 days of adoption of the rehabilitation plan, the plan sponsor must present the bargaining
17 parties with one or more schedules showing "revised benefit structures, revised contribution
18 structures, or both, if adopted." 29 U.S.C. § 1085(e)(1)(B). Among other things, the schedules
19 must "reflect . . . increases in contributions[] that the plan sponsor determines are reasonably
20 necessary to emerge from critical status." 29 U.S.C. § 1085(e)(1)(B). One of the schedules must
21 be called the "default schedule" which will assume that there are no increases in contributions
22 other than those necessary to emerge from critical status. Id. But the plan may include an

alternative schedule or schedules. Id. If the bargaining parties fail to adopt one of the schedules or another "consistent with" such schedules, then the "the plan sponsor shall implement the [default] schedule. . . ." Id. § 1085(e)(3)(C).

When the Trust adopted its Rehabilitation Plan in 2009 it established two funding options for employers: a "Preferred Schedule" and a "Default Schedule." (See Ex. A to Pl. Mot. at 4-5 (Dkt. No. 16-1 at 4-5).) The Preferred Schedule required a 75% increase in contributions over the negotiated rate over a three-year period. (Id. at 4.) And when the Trust amended the Rehabilitation Plan in late 2010, it included a similar "Preferred Schedule" for contributions that placed a 25% increase over the base rate. (See Ex. B to Pl. Mot. at 3-4 (Dkt. No. 16-1 at 18-19).)

As part of the CBA entered into between Peninsula and the Union for May 2010 through October 2011, Peninsula agreed to make contributions at a base rate of $3.95 per hour worked by each bargaining unit employee and an additional "Pension Rehabilitation" rate at $4.94 per hour worked by each bargaining unit employee. (Ex. D. to Pl. Mot. at 16 (Dkt. No. 16-1 at 41).) By agreeing to the "Pension Rehabilitation" rate, Peninsula agreed to the Trust's "Preferred Schedule" rate and not the default schedule rate in the Rehabilitation Plan. (Ex. B to Pl. Mot. at 3-4 (Dkt. 16-1 at 18-19).) In 2013, Peninsula again agreed to the Preferred Schedule rate when it negotiated and agreed to a CBA for a two-and-a-half-year term. (Ex. E to Pl. Mot at 17-18 (Dkt. No. 16-1 at 65-66).) And in 2016, Peninsula signed yet another CBA that included its agreement to the Preferred Schedule rate. (Ex. A-3 to the Declaration Jeremy Roller (Dkt. No. 15-1 at 67).) This CBA was in effect when Peninsula opted to withdraw from the CBA. It set base rate at $3.95 per hour and a "Rehab Plan Supplemental Contribution" that began at a rate of $4.94. (Id.)

Applying the formula set out in 29 U.S.C. § 1399(c)(1)(C)(i)(II), the Trustees calculated the highest contribution rate to be $8.394, which included the base rate and the "Preferred

1  Schedule" rate. The Trustees then calculated the quarterly installments to be $30,120. Peninsula
2  disagreed with the Trustees' determination of the highest contribution rate and initiated an
3  arbitration proceeding as required by ERISA. See 29 U.S.C. § 1401(a)(1). Arbitrator Paul
4  Dubow rejected the Trustees' calculation, finding that the Trustees' inclusion of the "Preferred
5  Schedule" rate "was not authorized by ERISA." (Roller Decl. Ex. B at 11.) Arbitrator Dubow
6  sided with Peninsula and ordered the Trustees to recalculate Peninsula's annual withdrawal
7  liability payment without consideration of the "Preferred Schedule" rate and to return
8  Peninsula's overpayments. (Id.) Arbitrator Dubow found the quarterly payment should be
9  $14,174, not $30,120. The Trustees then initiated this lawsuit to vacate Arbitrator Dubow's
10 order. See 29 U.S.C. § 1401(b)(2); (Complaint ¶ 17 and Prayer for Relief (Dkt. No. 1).)

## ANALYSIS

### A. Legal Standard

ERISA permits a party to an arbitration to appeal an arbitrator's award to a district court and seek an order to enforce, vacate, or modify the award. See 29 U.S.C. § 1401(b)(2). "Only these factual findings are presumed correct, 29 U.S.C. § 1401(c), and therefore the district court may review de novo all conclusions of law." Bd. of Trustees of W. Conf. of Teamsters Pension Tr. Fund v. Thompson Bldg. Materials, Inc., 749 F.2d 1396, 1405–06 (9th Cir. 1984). The Parties agree the facts are undisputed and the appeal presents only legal issues. Applying Rule 56, the Court must determine which cross-moving party "is entitled to a judgment as a matter of law." See Fed. R. Civ. P. 56(a); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986).

### B. The "Preferred Schedule" Rate Arises Under the CBA

The issue before the Court is whether Peninsula's agreement to make rehabilitation plan contributions pursuant to the "Preferred Schedule" rate "arises under" the CBA and must be

included in the "highest contribution rate" to determine its periodic withdrawal liability. The Court finds the rate arises under the CBA and must be included in determining Peninsula's withdrawal liability.

Under ERISA, an employer's periodic withdrawal liability "shall be the product of . . . the highest contribution rate at which the employer had an obligation to contribute under the plan during the 10 plan years ending with the plan year in which the withdrawal occurs." 29 U.S.C. § 1399(c)(1)(C)(i)(II). The statute defines "highest contribution rate" to include "an obligation to contribute arising . . . under one or more collective bargaining (or related) agreements." 29 U.S.C. § 1392(a)(1). But the statute does not define the terms "arising . . . under" and the parties dispute their meaning and scope. The Court must therefore give the terms "arising under" their ordinary meaning.

The Court's analysis of "arising under" begins with the plain language of the statute, see Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc., 530 U.S. 238, 254 (2000), because the Court "presum[es] that Congress intended that the words used be given their plain and ordinary meaning," United States v. Pacheco, 977 F.3d 764, 767 (9th Cir. 2020) (citation omitted). And the Court typically uses a dictionary to determine the ordinary meaning of an undefined term. See United States v. Santos, 553 U.S. 507, 511 (2008) (utilizing dictionary definitions). "The plain meaning of the text controls unless it is ambiguous or leads to an absurd result." Pacheco, 977 F.3d at 767.

The dictionary defines "arise" to mean: "to begin to occur or to exist; to come into being or to attention . . . to originate from a source." Arise, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/arise (last accessed Dec. 9, 2021). This broad definition is consistent with cases that have defined the term "arise" to mean "originating from,

having its origin in, growing out of or flowing from." United States ex rel. Welch v. My Left Foot Children's Therapy, LLC, 871 F.3d 791, 798 (9th Cir. 2017). The Supreme Court itself has explained that "the common usage of the word 'arise' . . . mean[s] 'come into being; originate' or 'spring up.' " Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369, 382 (2004) (quoting the Oxford English Dictionary and Black's Law Dictionary); see also Trs. of W. States Office & Pro. Emps. Pension Fund v. Welfare & Pension Admin. Serv., Inc., No. 3:19-cv-00811-SB, 2020 WL 2545315, at *5-6 (D. Or. May 19, 2020) ("WPAS") (applying the same definition in the context of determining whether ERISA's PPA surcharge "arises under" a CBA).

Considering these definitions of the term "arising under," the Court defines "highest contribution rate" to mean any obligation to contribute that arises out of, begins to occur from, originates from, grows out of, or flows from a CBA or related agreement. See 29 U.S.C. §§ 1392(a)(1), 1399(c)(1)(C)(i)(II). This is consistent with the definition of the term given by two courts who considered it in virtually the same context. See Assoc. Servs. of Wash., Inc. v. W. Metal Indus. Pension Fund, C21-427-JLR, Dkt. No. 20 at 21 (W.D. Wash. Sept. 24, 2021) ("ASW") (defining "arise" to mean "to begin to occur or to exist; to come into being or to attention . . . to originate from a source"); Bd. of Trustees of W. States Off. & Pro. Emps. Pension Fund v. Int'l Bhd. of Elec. Workers Loc. 483, No. 3:20-CV-00156-IM, 2020 WL 7318131 (D. Or. Dec. 11, 2020) ("WSOPE") (defining "arise" "to mean originating from, having its origin in, growing out of or flowing from")

Applying this definition, the Court finds that the Preferred Schedule rate must be included in the highest contribution rate. Peninsula's obligation to pay under the Preferred Schedule rate arises under or flows from its agreement to include that contribution rate in the CBA—which it did on no fewer than three occasions. And while Peninsula had no role creating

the Preferred Schedules in the Rehabilitation Plan, it specifically bargained for its inclusion in the CBA because "no change in rates was instituted simply upon the Trust's presentation of the rehabilitation plan." See ASW, Dkt. No. 20 at 21; (see also Def. MSJ at 10 n.6 (recognizing the parties have a "choice" as to the schedule).) ERISA itself confirms that Peninsula had a choice in choosing this rehabilitation plan contribution rate. The rehabilitation plan only sets "a range of options to be proposed to the bargaining parties" to be presented to the employer for bargaining. 29 U.S.C. § 1085(e)(3)(A); see 29 U.S.C. § 1085(e)(1)(B)(i) (noting that the adoption of a specific rehabilitation schedule is subject to the employer's approval); WSOPE, 506 F. Supp. 3d at 1085-86 (highlighting various statutory provisions showing the employer's ability to negotiate the rehabilitation schedule in the CBA); see also Bd. of Trustees of IBT Loc. 863 Pension Fund v. C & S Wholesale Grocers, Inc., 802 F.3d 534, 538 (3d Cir. 2015) (noting that the rehabilitation plan allows the participating employers to choose from new schedules when negotiating a CBA). And Peninsula likely could have negotiated for a different schedule so long as it was "consistent with" but not necessarily identical to the rehabilitation plan's schedules. See 29 U.S.C. § 1085(e)(3)(c)(i)(II) (stating that a default schedule will be imposed if a CBA does not adopt schedule "consistent with" but not identical to one in the relevant rehabilitation plan); WSOPE, 506 F. Supp. 3d at 1086. The Court finds that Peninsula's agreement to pay under the Preferred Schedule rate resulted from the bargaining process because Peninsula "ultimately ha[d] the say in choosing which rates to adopt." See ASW, Dkt. No. 20 at 21 (citing Trs. of Local 138 Pension Tr. Fund v F.W. Honerkamp Co. Inc., 692 F.3d 127, 132 (2d Cir. 2012)); see also Delta Sandblasting Co., Inc. v. Nat'l Labor Relations Bd., 969 F.3d 957, 968 (9th Cir. 2020) (upholding an order compelling an employer to bargain over a rehabilitation plan rate). As a result, Peninsula's obligation to contribute at the Preferred Schedule rate arises under the CBA

and must be included in the highest contribution rate calculation. This result also aligns with the purpose of the PPA—"to help severely underfunded multiemployer pension plans recover." Lehman, 862 F.3d at 1207.

The Court is unpersuaded by Peninsula's four contrary arguments.

First, Peninsula argues that the true origin of its obligation to pay under the Preferred Schedule rate is the Rehabilitation Plan, not the CBA. (Def. MSJ at 8.) While the Preferred Schedule's origins trace to the Rehabilitation Plan, Peninsula's obligation to pay under that rate originates, flows, or began to occur from the CBA. But for Peninsula's agreement to that rate, Peninsula would not have been obligated by make contributions under that rate schedule. See ASW, Dkt. No. 20 at 20-21; WSOPE, 506 F. Supp. 3d at 1085-86. Peninsula's contrary argument is unpersuasive.

Second, Peninsula argues that the Court's decision should be guided by several decisions finding that surcharges imposed on plans in critical status are excluded from the "highest contribution rate" calculation. (See Def. MSJ at 6-7, 9-10 (citing Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Just Born II, Inc., 888 F.3d 696, 704 (4th Cir. 2018); C&S, 5 F. Supp. 3d 707, 721 (D.N.J. 2014); WPAS, 2020 WL 2545315, at *9).) This argument lacks merit because these PPA surcharges differ in two fundamental ways from rehabilitation plan contributions. First, unlike rehabilitation plan contributions, the PPA-mandated surcharge occurs automatically when a plan enters critical status. See ASW, Dkt. No. 20 at 23-24; WSOPE, 506 F. Supp. 3d at 1086-87. The employer has no ability to negotiate over the surcharge and it is not a term bargained for in a CBA. This differs substantially from rehabilitation contribution rates, which are the subject of the collective bargaining process—a fact that impacts the Court's analysis of whether the rate "arises under" the CBA. See 29 U.S.C. § 1085(e)(3)(A); 29 U.S.C. §

1085(e)(1)(B)(i); ASW, Dkt. No. 20 at 24; WSOPE, 506 F. Supp. 3d at 1086-87. Second, the method by which the surcharge is calculated renders it distinct from rehabilitation contribution rates and outside of the withdrawal liability calculus. Courts considering the surcharge have concluded it is not a "contribution rate" because it is based on a percentage of employer contributions and thus not a "rate." WPAS, 2020 WL 2545315, at *6-8; C&S, 802 F.3d at 544. But the same is not true of a rehabilitation plan contribution rate which is "undoubtedly a contribution rate." ASW, Dkt. No. 20 at 24; see WSOPE, 506 F. Supp. 3d at 1086. The Court declines to extend the reasoning of cases considering the PPA surcharge to resolve the issue presented in this case.

Third, Peninsula argues that including the Preferred Schedule in the highest contribution rate will lead to "absurd results." This argument turns on a hypothetical involving a rehabilitation plan with only one schedule, which Peninsula presumes would be synonymous with a "default schedule" under 29 U.S.C. § 1085(e)(1)(B)(i)). Peninsula proposes a scenario in which two employers are bound by the default schedule—one that adopts it into the CBA and one that has it imposed by statute because it is not adopted into the CBA. (Def. Mot. at 11 (citing 29 U.S.C. § 1085(e)(3)(C)(iii)).) If the two employers withdraw, Peninsula argues that an absurd result would occur: the employer adopting the schedule in the CBA would have it included in the withdrawal liability calculation, while the other employer would not.

The Court is not persuaded that this hypothetical demonstrates absurd results forcing a different statutory construction. The hypothetical appears overly speculative and premised on several legal conclusions that remain debatable and outside of the actual dispute before the Court. See ASW, Dkt. No. 20 at 23. First, the Court is not persuaded that this scenario is particularly likely to occur. Peninsula points to a recent Ninth Circuit case involving an employer

who agreed to a default schedule in the CBA. (Def. Supp. Br. at 2 (citing Delta Sandblasting Co., Inc. v. NLRB, 969 F.3d 957 (9th Cir. 2020)). But this case did not also include another employer who had the default schedule imposed by statute—a key fact to Peninsula's hypothetical. Second, even if the hypothetical scenario was likely to occur, Peninsula's argument assumes without any reasoning that the default schedule imposed by statute would never be included in the highest contribution rate calculation. That precise issue is not before the Court and the parties have not briefed the question of whether such a rate might nevertheless be considered to "arise under" a CBA. And a court considering that distinct question may well conclude that a default rate imposed by statute "arises under" a CBA. The Court is unwilling to make the legal conclusion that Peninsula assumes to be true in its hypothetical, and the Court remains unconvinced that absurd results will occur from its construction of the statute. See ASW, Dkt. No. 20 at 23.

Fourth, Peninsula argues that construing the rehabilitation plan contributions as arising under the CBA will impermissibly render the ERISA's enforcement mechanism for delinquent or unpaid rehabilitation plan payments superfluous. (Def. MSJ at 12.) The Court is unconvinced by this argument. To understand the argument, the Court reviews ERISA's enforcement mechanisms.

ERISA has long had an enforcement provision for unpaid or delinquent contributions that are contractually due under a multiemployer plan CBA. 29 U.S.C. § 1145; Laborers Health & Welfare Tr. Fund for N. Cal. v. Advanced Lightweight Concrete Co., Inc., 484 U.S. 539, 546 (1988) (concluding that Section 1145's enforcement provision "plainly describes the employer's contractual obligation to make contributions but omits any reference to a noncontractual obligation."). When Congress passed the MPRA in 2014, it added a provision stating that "Any

failure to make a contribution under a schedule of contribution rates provided under this subsection shall be treated as a delinquent contribution under section 1145 of this title and shall be enforceable as such." 29 U.S.C. § 1085(e)(3)(C)(iv). Peninsula argues that if rehabilitation plan contributions arise under a CBA, then the provision in Section 1085(e)(3)(C)(iv) is rendered superfluous by Section 1145 which already provides for enforcement of contractual obligations. (Def. MSJ at 13 (citing Rubin v. Islamic Republic of Iran, ___ U.S. ___, 138 S. Ct. 816, 824 (2018).)

Peninsula has not persuaded the Court that this is the only plausible construction of Section 1085(e)(3)(C)(iv)'s enforcement provision. While Peninsula has identified a potential way in which this section could be read to be superfluous, there exists an alternative, reasonable construction that construes the statute "so that effect is given to all its provisions." See Rubin, 138 S. Ct. at 824. The Court finds instead that Section 1085(e)(3)(C)(iv)'s enforcement provision concerns only those rehabilitation plan obligations that are imposed by default and not in a CBA. See ASW, Dkt. No. 20 at 25; WSOPE, 506 F. Supp. 3d at 1087, 1089-90. This reading more faithfully tracks Section 1085(e)(3), which envisions rehabilitation contribution payments being due because of a CBA (and thus contractual) and because of ERISA's statutory default schedule outside of a CBA. The enforcement provision in Section 1085(e)(3)(C)(iv) is located in precisely the same provision requiring the default schedule to be imposed when the parties do not include any rehabilitation plan schedule in a CBA. As the Court in ASW noted, "§ 1085(e)(3)(C)—the very subsection where the enforcement provision is found—contemplates a noncontractual situation: when the bargaining parties 'fail to adopt a contribution schedule,' causing the default schedule to be implemented by law." ASW, Dkt. No. 20 at 25 (quoting 29 U.S.C. § 1085(e)(3)(C)(i)-(ii)). So while Section 1145 provides for enforcement of rehabilitation plan

1 payments due under a CBA, the Section 1085(e)(3)(C)(iv) ensures a mechanism to enforce noncontractual obligations due under a default schedule imposed by law. This reading of the enforcement provision gives meaning to all of the provisions and harmonizes with the Court's definition and application of the term "arising under." See Rubin, 138 S. Ct. at 824.

Peninsula also argues that this analysis ignores the plain language of Section 1085(e)(3)(C)(iv) and improperly limits it to enforcing only default contributions schedules. Peninsula points out that Section 1085(e)(3)(C)(iv) enforces "contribution rates provided under this subsection," and that the phrase "subsection" must refer to Section 1085(e), because Section 1085(e)(3)(C) is actually a "sub-paragraph." (Def. MSJ at 15; Def. Supp. Brief at 4-6.) The Court is not convinced that the use of "subsection" necessarily requires the Court to conclude that Congress believed all rehabilitation plan payments are noncontractual. While the use of "sub-paragraph" could have been more specific to identify noncontractual obligations due under Section 1085(e)(3)(C), Section "1085 commonly utilizes 'subsection' to refer to the third sublevel of headings." ASW, Dkt. No. 20 at 26 (citing 29 U.S.C. § 1085(e)(8)(A)(ii) (referring to "subsection (b)(3)(D)"). Congress's lack of precision does not support Peninsula's strained argument which focuses too narrowly on a single word without considering the enforcement provision's location in the statute or the context of how rehabilitation contribution plan rates can be imposed. Read in its full context, Section 1085(e)(3)(C)(iv) refers to noncontractual obligations imposed by default, and the Court rejects Peninsula's contrary argument.

The Court separately notes that its analysis of ERISA's enforcement mechanism of default contribution payments does not necessarily resolve the question of whether obligations to pay under a default schedule do or do not "arise under" a CBA or related agreement for purposes of calculating the highest contribution rate. Those present separate inquiries that are not before

1  the Court. And a court might well conclude that an obligation to pay under a default schedule

2  "arises under" a CBA or related agreement even if it is noncontractual in nature. Such a

3  conclusion would align with Peninsula's view that determining whether an obligation "arises

4  under" a CBA cannot simply be resolved by looking at the terms of the CBA.

5  **C.      Divining Past Congressional Intent from New Legislation**

6  When Congress passed the MPRA, it included a provision that requires exclusion of any

7  rate increases in a rehabilitation schedule from the "highest contribution rate." 29 U.S.C. §

8  1085(e)(G)(3)(A). Peninsula argues the amendment "clarifies" Congress original intent was

9  never to include any rehabilitation contributions in the "highest contribution rate" calculation. As

10 other courts faced with the same or similar argument have done, the Court declines to engage in

11 the "hazardous venture . . . [of] draw[ing] any conclusions from the enactment of the MPRA"

12 due to the "dearth of legislative history for the MPRA and the lack of clear statutory language."

13 C&S, 802 F2d at 546; see ASW, Dkt. No. 20 at 26-27; WSOPE, 506 F. Supp. 3d at 1090;

14 WPAS, 2020 WL 2545315, at *9.). The Court agrees with these decisions on this issue and

15 declines the invitation to engage in such speculation.

16                                         **CONCLUSION**

17 Having reviewed the detailed arguments presented by both Parties, the Court finds that

18 the Arbitrator erred as a matter of law. Considering the plain meaning of the terms at issue and

19 giving meaning to all relevant statutory provisions, the Court finds that the highest contribution

20 rate must include the Preferred Schedule rate set forth in the CBAs. This statutory construction

21 flows from the ordinary meaning of the terms at issue without leading to any absurd results or

22 rendering any provisions superfluous. It also aligns with the PPA's "design[] to help severely

23 underfunded multiemployer pension plans recover." Lehman, 862 F.3d at 1207.

24

1  The Court therefore GRANTS the Trustees' Motion and DENIES Peninsula's Motion.
2  The Court VACATES the Arbitrator's award and shall separately enter judgment affirming the
3  Trustees' calculation of Peninsula's withdrawal liability pursuant to which Peninsula must make
4  corresponding quarterly payments.
5      The clerk is ordered to provide copies of this order to all counsel.
6      Dated December 17, 2021.

Marsha J. Pechman
United States Senior District Judge